811 So.2d 557 (1998)
Roy BURGESS, Jr.
v.
STATE.
CR-94-0475.
Court of Criminal Appeals of Alabama.
December 18, 1998.
Rehearing Denied February 5, 1999.
*563 Roy Scott Anderson, Decatur; Joseph W. Propst II, Decatur; Bryan A. Stevenson, Montgomery; and Shelly Slate Waters, Decatur, for appellant.
*564 Bill Pryor, atty. gen., and Michael B. Billingsley, asst. atty. gen., for appellee.
LONG, Presiding Judge.
The appellant, Roy Burgess, Jr., was convicted of murder made capital because it was committed during the course of a robbery in the first degree. See § 13A-5-40(a)(2), Ala.Code 1975. The jury, by a vote of 10-2, recommended that Burgess be sentenced to life imprisonment without parole. The trial court overrode the jury's recommendation and sentenced Burgess to death.
The state's evidence tended to show that on the afternoon of August 12, 1993, Burgess visited his friends Demetrius Stevenson, Richie Jones, Kevin Matthews, and Will Hatton at their apartment on Graymont Lane in Decatur. Burgess, who was 16 years old at the time, had a .25 caliber pistol in his possession; he complained to his friends that he needed money and proceeded to tell them about a plan to make money by robbing someone or by stealing a car or a car stereo. Testimony indicated that Burgess and the others sat around the apartment for some time discussing this plan. Sometime between 6:00 and 7:00 p.m. that evening, Burgess, Stevenson, and Jones got a ride to a local shopping mall from Larry Hays, who lived across the street from Stevenson and Jones. At the mall, Burgess remained in the parking lot while the others went inside. Stevenson and Jones testified that when they came out of the mall at around 8:30 p.m., they saw Burgess getting into a white truck in the parking lot. Stevenson and Jones then walked back to their apartment without Burgess. According to Stevenson and Jones, Burgess returned to their apartment sometime between 9:00 and 9:30 p.m. and told them that the people in the truck had given him a dollar but they "didn't have anything." Burgess remained at the apartment for another 15 minutes before leaving by himself.
Stevenson and Jones testified that Burgess returned to their apartment again at approximately 10:30 p.m. and asked them if they wanted to go to a party at Cedar Lake in Decatur. They testified that after agreeing to go to the party, they walked outside with Burgess, whereupon Burgess introduced them to 16-year-old Kevin Gardner, the victim, who was sitting in his car in the apartment parking lot. Stevenson and Jones testified that Burgess told them that Gardner had agreed to drive them to the party. The three men got into Gardner's car, with Burgess sitting in the front passenger seat and Stevenson and Jones sitting in the backseat. Gardner then proceeded to drive on Ray Avenue in Decatur, in the direction of Cedar Lake. Stevenson and Jones testified that Burgess and Gardner were engaged in some kind of conversation in the front seat, but that they could not hear what was being said because the car stereo was turned up so loud. Gardner continued to drive on Ray Avenue to a remote area where the road was no longer paved and there were no houses nearby. Stevenson and Jones testified that at that point, Gardner said that he did not want to drive any farther and told his passengers that they would have to get out and walk. According to Stevenson and Jones, Burgess then opened his door and quickly turned around and shot Gardner in the head with his pistol. Stevenson and Jones testified that Burgess then pulled Gardner's body out of the car and dragged it to some bushes by the side of the road. Burgess then got behind the wheel of Gardner's car, and drove Stevenson and Jones back to the apartment on Graymont Lane.
Kevin Matthews and Will Hatton were at the apartment when the three men arrived in Gardner's car. Testimony indicated that the group decided to drive Gardner's car to Birmingham to sell it to a "chop shop." Before leaving for Birmingham, *565 Stevenson went across the street to Larry Hays's apartment and told Hays what had happened. Stevenson then asked Hays to follow them to Birmingham. Stevenson, Jones, and Hatton rode to Birmingham with Hays in Hays's car, while Burgess and Matthews travelled in Gardner's car, with Burgess driving. After the group arrived in Birmingham, they were unable to find a "chop shop" where they could sell Gardner's car. They decided to leave Gardner's car in the parking lot of a Birmingham nightclub. Before abandoning Gardner's car, they took several items from the car, including the stereo equipment, several compact discs, and a portable compact disc player. They then returned to Decatur in Hays's car.
Stevenson and Jones testified that the following day, August 13, 1993, they sold the stereo equipment that they had taken from Gardner's car. Later that same day, at approximately 5:30 p.m., Stevenson, Jones, and Matthews went to Stevenson's grandmother's house in the Cedar Lake area, close to where Gardner's body had been left. At that time, the three men decided to call the Decatur police. Jones telephoned the police, telling them that he and two of his friends had found a dead body while picking blackberries. The police officer who responded to the call met Stevenson, Jones, and Matthews at Stevenson's grandmother's house. The men then took the officer to Gardner's body. At that time, a homicide investigation was initiated, and several more officers were called to the scene. After questioning Stevenson, Jones, and Matthews at the scene, the police took down their names and allowed them to leave.
The following day, August 14, 1993, law enforcement authorities located Gardner's car in Birmingham. With no other leads in their homicide investigation, Decatur police focused their suspicion on Stevenson, Jones, and Matthews. The three men were brought to the police station for questioning. The questioning was conducted individually. After initially denying any knowledge of Gardner's murder, all three men eventually told the police that Burgess had killed Gardner. After consulting with the district attorney, the police told Stevenson, Jones, and Matthews that if the evidence showed that they were telling the truth and that they had not killed Gardner, they would not be charged with Gardner's murder.
After obtaining a petition to arrest Burgess for Gardner's murder, Decatur police arrested Burgess at his parents' residence on August 16, 1993. Burgess was transported to the police station, where he gave police a statement. In his statement, Burgess maintained that on the evening of the shooting, he had seen Gardner coming out of a convenience store near the mall and had asked Gardner, whom he said he knew from school, for a ride to his friends' apartment on Graymont Lane. Burgess stated that Gardner agreed to give him a ride and then drove him to the apartment. Burgess stated that when they arrived at the apartment, he tried to warn Gardner that Stevenson and Jones intended to rob him, but Gardner was not concerned. Burgess stated that Stevenson and Jones got into Gardner's car with him and that Gardner then proceeded to the remote area on Ray Avenue, where, Burgess stated, Stevenson and Jones intended to rob Gardner. Burgess stated that during the robbery, he pointed his gun at Gardner and that the gun accidentally discharged, shooting Gardner in the head.
In compliance with their immunity agreements, the state did not prosecute Stevenson or Jones for any participation in the crime. Although Stevenson and Jones admitted at Burgess's trial that earlier on the day of the shooting they had participated in the discussion with Burgess concerning *566 Burgess's plan to steal a car or a car stereo, both men testified that they had no prior knowledge of Burgess's intention to rob or to kill Gardner. Both men testified that when they left their apartment with Burgess and Gardner in Gardner's car, they believed Gardner was taking them to a party.
The state also presented testimony from Roderick Reynolds, who was being held in the same juvenile detention facility as Burgess following Burgess's arrest. Reynolds testified that while he was in the juvenile detention facility with Burgess, Burgess told him that he had killed a "white boy" and had left the boy's body in some bushes.
Burgess's theory of defense at trial was that his older companionsStevenson and Jonesconceived and organized the plan to steal a car or a car stereo to make some money and that Stevenson and Jones were the main participants in the robbery and murder of Gardner. Stevenson was 18 at the time of the offense, and Jones was 19. Contrary to his statement to police, Burgess testified at trial that he did not shoot Gardner and maintained instead that Stevenson had shot Gardner. Although he acknowledged that he had had a gun on the night of the murder, Burgess testified that it did not work. He maintained that Stevenson also had a gun. Burgess testified that after his arrest, he told the police that he had killed Gardner only because he thought the police would help him and that he would not be tried as an adult. Burgess further testified that on the day of the murder, a man came to the apartment on Graymont Lane to see Stevenson and to ask Stevenson to repay him money that he owed him. According to Burgess, Stevenson said that he would have to steal a car to get the money to repay the man. Burgess testified that he had asked Gardner for a ride to the apartment on Graymont Lane so that he could pick up his clothes and some food that he had left there earlier in the day. He maintained that he intended to walk home after retrieving these items, but that he did not do so because he felt responsible for Gardner and believed that he could not leave Gardner alone with Stevenson and Jones. Burgess presented the testimony of several witnesses who claimed that Stevenson had told them that he, and not Burgess, had shot Gardner.
On appeal from his conviction, Burgess raises 23 issues, many of which he did not raise by objection in the trial court. Because Burgess was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against Burgess as to any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Rule 45A, Ala.R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
This court has recognized that "`the plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641, 645 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 *567 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting in turn United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)). Accordingly, we will address the issues raised by Burgess on appeal.

GUILT-PHASE ISSUES

I.
Burgess contends that he was improperly transferred from the juvenile court to the circuit court for prosecution as an adult. (Issue XI in appellant's brief.) In this regard, he argues that the juvenile court's transfer order was inadequate and that it violated his constitutional rights. This issue is not properly before this court on Burgess's direct appeal from his conviction.
It is well settled that an appeal must be taken in the manner and within the time prescribed by this State's rules of procedure. As this court stated in Symanowski v. State, 606 So.2d 171 (Ala.Cr.App. 1992):
"`An appeal shall be dismissed if the notice of appeal was not timely filed to invoke the jurisdiction of the appellate court.' This requirement of timely filing of the notice of appeal is `a jurisdictional act'; `[i]t is the only step in the appellate process which is jurisdictional.' Committee Comments, Rule 3. See also Lewis v. State, 463 So.2d 154, 155 (Ala.1985); Woods v. State, 371 So.2d 944, 945 (Ala. 1979); Turner v. State, 365 So.2d 335, 335 (Ala.Cr.App.), cert. denied, 365 So.2d 336 (1978).
"`In the absence of statutory authorization, neither the trial nor appellate courts may extend or shorten the time for appeal ... even to relieve against mistake, inadvertence, accident, or misfortune....' Meeks v. State Farm Mut. Auto. Ins. Co., 286 Ala. 513, 515, 243 So.2d 27, 28 (1970) (quoting with approval Hanley v. Hanley, 23 Cal.2d 120, 142 P.2d 423, 149 A.L.R. 1250, 1261-67 (1943)). `In the interest of finality of judgments, the prescribed time within which a notice of appeal must be filed with the trial court cannot be waived nor is it subject to extension of time by agreement of the parties or by order of this Court.' Stewart v. Younger, 375 So.2d 428, 428 (Ala.1979) (emphasis in original). See also Hayden v. Harris, 437 So.2d 1283, 1287 (Ala.1983); State v. Kebe, 399 So.2d 348 (Ala.1981) (wherein our supreme court noted that a United States District Court could not confer to the court the authority to extend the 42-day period)."
606 So.2d at 172. "`Under Alabama law the right to appeal is a creature of statute, and such statutes are strictly construed. There is no inherent or inalienable right of appeal, but such right is purely statutory.'" Id. at 173, quoting Wood v. City of Birmingham, 380 So.2d 394, 396 (Ala.Cr. App.1980) (citations omitted).
Rule 28(A), Ala.R.Juv.P., provides, in pertinent part:
"(2) If the appeal provided in this subsection is taken from a final order, judgment, or decree in a case or proceeding arising out of the jurisdiction of the juvenile court over a child, as that term is defined in § 12-15-1(3), Ala. Code 1975, the appropriate appellate court for purposes of the appeal shall be (a) the Court of Criminal Appeals in proceedings in which a child is adjudicated delinquent and proceedings in which a motion seeking an order to transfer a child to the adult court for criminal prosecution is either granted or denied, and (b) the Court of Civil Appeals in any other case of proceeding."
Rule 28(C), Ala.R.Juv.P., provides:

*568 "Written notice of appeal shall be filed within 14 days of the date the judgment, order, or decree appealed from is filed in the clerk's office, whether the appeal is to an appellate court or to the circuit court for trial de novo."
Burgess did not appeal from the juvenile court's order transferring him to the circuit court to be tried as an adult. Thus, we are without jurisdiction to entertain Burgess's claim in this direct appeal from his conviction for capital murder. His juvenile transfer hearing was a separate and independent proceeding apart from the instant proceeding, and he should have raised any alleged claims of error in the transfer hearing at the proper time. Since his transfer to circuit court, Burgess has been tried and convicted of capital murder. He cannot now attempt to raise a claim that should have been separately raised in an appeal to this court within 14 days from the date of the juvenile transfer order, Rule 28(C), Ala.R.Juv.P., which date would have been no later than October 12, 1993.
Because this court lacks jurisdiction to entertain Burgess's claims concerning the propriety of his transfer from the juvenile court to the circuit court for prosecution as an adult, we cannot review those claims in this proceeding, even under a plain error analysis. Rule 45A, Ala.R.App. P., provides for plain error review only "in the proceedings under review." (Emphasis added.)

II.
Burgess contends that he was denied his right to a fair trial and an impartial jury when the trial court refused to allow him to conduct individual, sequestered voir dire examination of the venire in order to determine whether prospective jurors had been affected by pretrial publicity. (Issue XVI in appellant's brief.)
The 48-member venire in Burgess's case was questioned in four panels.[1] This court has held that questioning the venire in panels meets the requirements of due process and provides reasonable assurance that any prejudice on the part of the jurors will be exposed. Haney v. State, 603 So.2d 368, 402 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).
"`In Alabama, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This rule applies to capital cases, and the granting of a request for individual voir dire is discretionary with the trial court.' Coral v. State, 628 So.2d 954, 968 (Ala. Cr.App.1992). `The fact that the appellant's case involved capital murder is not alone reason to require individual voir dire.... A trial court's decision in denying individual voir dire examination of a jury panel will not be disturbed on appeal absent an abuse of that discretion.' Smith v. State, 588 So.2d 561, 579 (Ala.Cr.App.1991). See also Henderson v. State, 583 So.2d 276, 283 (Ala.Cr.App. 1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992)."
Taylor v. State, 666 So.2d 36, 66 (Ala.Cr. App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). See also Smith v. State, 588 So.2d 561 (Ala.Cr.App.1991); and George v. State, 717 So.2d 827 (Ala.Cr. App.), aff'd in relevant part, rev'd in unrelated part, 717 So.2d 844 (Ala.1996), aff'd on return to remand, 717 So.2d 849 (Ala. *569 Cr.App.1997), aff'd, 717 So.2d 858 (Ala. 1998).
The record reflects that Burgess initially moved for individual, sequestered voir dire examination of all prospective jurors. In the alternative, he requested that he at least be allowed to conduct individual, sequestered voir dire of those prospective jurors who had indicated that they had heard about his case. Although Burgess maintains in his brief to this court that he "submitted a great deal of information" to the trial court in support of his motion for individually sequestered voir dire examination, the record reflects that the only thing Burgess actually offered to the trial court in this regard was the general argument that the absence of individually sequestered voir dire would create the risk that one juror's answers concerning his or her prior knowledge of the case could taint the impartiality of the other jurors on the venire.
After conducting a hearing on Burgess's motion, the trial court denied his request for individually sequestered voir dire. The trial court stated that it would divide the venire into 4 or 5 panels of 12 jurors each and allow counsel to question the panels. (R. 107.) The trial court did state, however, that possibly "when we are voir diring a jury or a jury panel that I could come back and permit an individually sequestered voir dire of some prospective jurors." (R. 107.) In addition, the trial court informed the parties that if one juror on a panel said something to contaminate the entire panel, it would certainly entertain a motion to exclude that panel. (R. 110.) The record reflects that there was no further request by Burgess during the voir dire process for any individual questioning of jurors on any subject, including pretrial publicity. In a written order denying Burgess's motion for individually sequestered voir dire, the trial court specifically stated, "Should individual voir dire become necessary, the Court will implement it at the appropriate time and in a manner that is consistent with the circumstances at hand." (C. 292.)
Burgess offered no evidence, either at trial or on appeal, to show how he was prejudiced as a result of prospective jurors being questioned in panels, as opposed to being questioned individually in a sequestered setting. On appeal, he has offered only general arguments concerning the possibility of prejudice and has failed to show that any comments by a prospective juror improperly influenced other members of a panel. He has presented no proof that the pretrial publicity was so extensive that the method of voir dire was inadequate to assure juror impartiality. As the state correctly points out in its brief to this court, the trial court granted all of Burgess's challenges for cause as to jurors whose impartiality may have been affected by pretrial publicity.
"A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion." Ex parte Land, 678 So.2d 224, 242 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996). A careful review of the record indicates that the method of voir dire employed by the trial court was sufficient to "provide[ ] reasonable assurance that prejudice would have been discovered if present." Haney, supra, 603 So.2d at 402. Accordingly, we find that the trial court did not abuse its discretion by denying Burgess's motion for individual, sequestered voir dire.

III.
Burgess contends that the trial court improperly excused three prospective jurors for cause based on their views concerning the death penalty. (Issue X in appellant's brief.) He argues that although *570 these prospective jurors may have expressed reservations about the death penalty, their responses during voir dire did not reveal such a fixed opinion against the death penalty that they would have been unable to render a fair and impartial verdict. See Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
"[W]hether a prospective juror in a capital murder case is properly excluded based on the juror's views concerning the death penalty involves a question of fact. Therefore, a proper review of this determination requires that we give great deference to the trial judge's discretion, because the judge was present and capable of observing the potential jurors and their responses." Price v. State, 725 So.2d 1003, 1025 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), citing Wainwright v. Witt, supra.
In Clemons v. State, 720 So.2d 961 (Ala. Cr.App.1996), aff'd, 720 So.2d 985 (Ala. 1998), this court stated:

"`Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), set the early standard for a court's exclusion for cause of venirepersons who oppose the death penalty. The Court in dicta in Witherspoon limited exclusion for cause to those venirepersons who made it "unmistakably clear (1) that they would automatically vote against imposition of capital punishment... or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." Id. 522-23 n. 21, 88 S.Ct. at 1777 n. 21. Subsequently, in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court clarified or modified its decision in Witherspoon by holding that the state may exclude venirepersons in capital cases whose views would "`prevent or substantially impair the performance of [their] duties as a juror in accordance with his instruction and [their] duties as a juror in accordance with his instruction and [their] oath.'" Id., 469 U.S. at 424, 105 S.Ct. at 852 (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). The new Witt standard dispensed with the Witherspoon reference to "automatic" decisionmaking, and eliminated the requirement that a venireperson's bias be proved with "unmistakable clarity." 469 U.S. at 424, 105 S.Ct. at 852.'"
720 So.2d at 972. See also Travis v. State, 776 So.2d 819 (Ala.Cr.App.1997); and Daniels v. State, 650 So.2d 544 (Ala.Cr. App.1994), cert. denied, 514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995).
Although Burgess complains in his brief to this court that three prospective jurors were improperly removed for cause, he specifically refers to the voir dire responses of only one prospective juror, Juror A. However, based on Burgess's citations to the record, this court presumes that the other two prospective jurors to whom Burgess refers are Jurors L. and M.
The record reveals that during the voir dire questioning by both the prosecution and the defense, each of these three prospective jurors clearly indicated strong opposition to the death penalty. (R. 475, 477, 478, 479, 527 (Juror L.); 480, 481, 484, 524, 525, 526 (Juror M.); 488, 489, 523, 524, 527, 528 (Juror A.).) The record further reveals that after the attorneys completed questioning Jurors A., L., and M., the trial court further questioned them concerning their views on the death penalty. The trial court noted that its further questioning of these prospective jurors was an attempt to clearly understand the position of each juror so that it could properly rule on any challenges for cause. (R. 570.)
*571 The record shows the following with regard to the voir dire of the prospective jurors by the trial court:
"THE COURT: ... Now, I have written down or tried to write down several comments or answers that several of you have given so that I could determine what your view or what your position was with regard to this question [concerning their views on the death penalty]. I will have to talk to three or four of you individually. I will repeat again that there is not a right or wrong answer to this. I'm trying to determine what your answer is. [Juror L.], you told me somewhat about your views and feelings about the death penalty. Do you have such a deep-seated objection or deep-seated feeling about capital punishment, such a deep-seated objection that your ability to follow the law as the Court gives you the law would be substantially impaired?
"[Juror L.]: I am afraid I'm going to have to answer yes. I have stout beliefs in my heart about capital punishment or about death, as far as one human being taking another human beings life. I don't think we as human beings are in a position to rule over that.
"THE COURT: Okay. [Juror A.], I want to ask you the same question. Do you have such a deep-seated objection or deep-seated feeling about capital punishment that your ability to follow the law and instructions that the Court gives you as to how the law should be applied would be substantially impaired?
"[Juror A.] I would never vote to put somebody to death.
"THE COURT: I don't mean to be picky, but the use of the word `probably' concerns me [sic]. That's fine if that's your answer. I don't want to put words in your mouth, but I want to know if the Courtno, I will just accept your answer unless you have something else to tell me.
"[Juror A.]: Court or no Court, I would not.
"THE COURT: Pardon?
"[Juror A.]: Court or no Court, I would not.
"THE COURT: Okay. [Juror M.], I want to ask you the same question. You told me how you felt about capital punishment. Earlier you mentioned that you thoughtyou mentioned the needle and I think you were talking about capital punishment in that fashion, and one of the attorneys said that in Alabama it means death by electrocution. In Alabama when the death penalty is administered, that is the fashion in Alabama. I want you to understand that, if that makes any difference to you. Really we are just talking about capital punishment here. I want to know if you have such a deep-seated objection or deep-seated feeling about capital punishment that your ability to follow the law and the instructions the Court would give you as to how the law should be applied would be substantially impaired?
"[Juror M.]: Well, if it reads like that in the law, I guess I would have to go along with the law, wouldn't I?
"THE COURT: I'm going to ask you a question that one of the attorneys asked. Of course, we are not asking you how you would vote. You don't know how you would vote because you haven't heard the trial or the evidence and you haven't heard the law explained to you. We don't know how you would vote, but the attorneys were asking you could you if the circumstances and the facts of the case worked out and the law worked out where the death penalty was something to be considered, could you consider it or not?
"[Juror M.]: No, sir.
"THE COURT: You are shaking your head no. You could not consider it?

*572 "[Juror M.]: I wouldn't consider giving him the electric chair."
". . . .
"THE COURT: If I explained it any better or any different to the point, [Juror L.], that you want to explain your answer to me better or different or anything, that is fine.
"[Juror L.]: No.
"THE COURT: [Juror A.], did I explain it any better to you to the point that you could tell me that it would be terribly hard but you could do it, or is your view stillyou tell me what it is.
"[Juror A.]: I could go by the law, but I couldn't put the death penalty on anybody.
"THE COURT: Okay, [Juror M.], do you have any addition to anything you told me earlier?
"[Juror M.]: No, sir."
(R. 555-62.)
Clearly, the voir dire responses of the three prospective jurors who were excluded for cause showed more than just a "reluctance" to impose the death penalty. All three prospective jurors gave answers to the questions asked during voir dire indicating that their views on the death penalty would "prevent or substantially impair" their duties as jurors. Burgess had no reasonable basis to dispute the challenges for cause; therefore, we find no merit to his claim.

IV.
Burgess contends that the trial court erred when it allowed the state to use peremptory strikes against prospective jurors who expressed reservations about the death penalty. (Issue XXI in appellant's brief.)
As this court stated in Johnson v. State, 620 So.2d 679 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993):
"Although a juror's reservations about the death penalty may not be sufficient for a challenge for cause, his view may constitute a reasonable explanation for the exercise of a peremptory strike. See Fisher v. State, 587 So.2d 1027 (Ala. Cr.App.1991), cert. denied, Ex parte Fisher, 587 So.2d 1039 (Ala.1991). Questions which concern jurors' attitudes regarding the death penalty `are not limited to those questions which would elicit information which would constitute grounds of a challenge for cause.' Arthur v. State, 472 So.2d 650, 658 (Ala.Cr.App.1984), rev'd on other grounds, 472 So.2d 665 (Ala.1985) (citation omitted)."
620 So.2d at 696. See also Click v. State, 695 So.2d 209, 220 (Ala.Cr.App.1996), cert. denied, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997). Accordingly, Burgess's claim is without merit.

V.
Burgess contends that the state used its peremptory strikes in a racially discriminatory manner, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). (Issue V in appellant's brief.) Specifically, Burgess argues that the state improperly used 2 of its 13 peremptory strikes to remove 2 of the 3 black prospective jurors from the jury venire. The record reflects that the prosecutor used his fifth and eighth strikes to remove two black veniremembers. Burgess used his twelfth strike to remove the remaining black prospective juror from the jury venire.
The party alleging racially discriminatory use of peremptory challenges bears the burden of establishing a prima facie case of discrimination. Ex parte Branch, 526 So.2d 609, 622 (Ala.1987). Once a prima facie case has been established, a presumption is created that the peremptory challenges were used to discriminate *573 against black jurors. Id. at 623. Where the prosecutor is required to explain his peremptory strikes, he or she must offer "`a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory. However, this showing need not rise to the level of a challenge for cause.'" McLeod v. State, 581 So.2d 1144, 1155 (Ala.Cr.App.1990), quoting Ex parte Branch, 526 So.2d at 623. (Emphasis in Branch; citation omitted.) Once the responding party has articulated a race-neutral reason or explanation for eliminating the challenged jurors, the moving party can offer evidence showing that the reason or explanation is merely a sham or pretext. Ex parte Branch, 526 So.2d at 624. When the trial court has followed this procedure, its determination will be overturned only if that determination is "clearly erroneous." Id. at 625. Accordingly, we will review the relevant portions of the record in determining whether the trial court's determination was "clearly erroneous."
After the jury was struck in Burgess's case, Burgess's counsel presented a Batson motion, challenging the state's strikes of two black prospective jurors, Jurors nos. 31 and 57. Before the trial court could make an express finding as to the existence of a prima facie case of racial discrimination by the state, the prosecutor stated his reasons for striking Jurors nos. 31 and 57. After the prosecutor gave his reasons, the trial court stated for the record that a prima facie case of racial discrimination had been established. However, the trial court then denied Burgess's Batson motion.
The record reflects that the prosecutor stated the following reasons for striking Juror no. 31:
"[Burgess's counsel] alleged that he washe was a very quiet juror. In fact, as observed by myself and I will be glad to call a witness if the Court doesn't want to take my word for it, ... he slept through the first day of the Court's instructions during the general qualification. He was seated on the right side of the courtroom which, for purposes of the record, is the side that we directly face from our counsel table. I don't recall what row he sat on but there was no one in front of him and he sat there and slept nearly all day. We did not feel that would make him a very attentive or capable juror in this case."
(R. 941-42.) After hearing the prosecutor's reasons for striking Juror no. 31, the trial court stated, "I don't know if he was asleep, but he did appear to be inattentive and appeared at times to be asleep." (R. 943; see also R. 951.) This court has repeatedly held that the fact that a veniremember appears to be inattentive, asleep, or dozing during the proceedings is a valid race-neutral reason for exercising a peremptory strike. See Kelley v. State, 602 So.2d 473, 476 (Ala.Cr.App.1992); Mitchell v. State, 579 So.2d 45, 49 (Ala.Cr.App. 1991), cert. denied, 596 So.2d 954 (1992); Smith v. State, 531 So.2d 1245, 1248 (Ala. Cr.App.1987).
The prosecutor stated the following reasons for striking Juror no. 57:
"... The notes I made about [Juror no. 57] were that he, in response to [Burgess's counsel's] questions, responded that he knewthis may not be an exact quote but this is my recollection of what he said. He knew of cases where young people get coerced and it wasn't their idea.... I believe the defense is going to at least be in part from things that have been said and based on my experience that the other two individuals that were with the defendant in this case were older than him, that it was their idea and they did it, that he was a minor player involved and that the other person that was with those two that went *574 out there was an older player. In addition, we anticipate in this case we will offer into evidence a statement of the defendant which is not entirely a confession but it is inculpatory. We intend to offer it and we think it is evidence that will help us. My experience as a trial lawyer tells me that a fellow already talking about he knows of cases where young people get coerced and it wasn't their idea is not going to be an ideal juror for us in this situation. I have some problem with the word `coercion' being used. That indicates to me that if there is an attack on the defendant's statement, coercion is a key element in that we have to show that he was not coerced in giving the statement. Given his age and so forth, we felt like that made him less than an ideal juror. On the death penalty, when I asked that panel the question could they impose the death penalty assuming that the evidence was present and I explained many times to every panel what I meant when I said `assume,' that I was not asking them to guess somebody into the electric chair, but the only way I could do that was to ask them to assume. Every juror on that panel answered in the affirmative that they could, except for the one that was challenged for cause and another fellow who expressed doubt, which would be a white individual, [Juror] no. 61. He expressed doubt and he was my first strike today. Juror no. 1 expressed doubt and was challenged for cause by the State. The only other one on that panel that did not answer the question and he responded `I don't know' when I got to him was [Juror no. 57]. Additionally I would point out to the Court that a part of the defendant's challenge of the other group of jurors that we struck they allege as a group, in regard to their feelings on the death penalty, [Burgess's counsel] included this Juror no. 57 as being one of those who had expressed doubt on the death penalty and argued that our strike should not have been allowed for that cause. I would assume that is to some degree an admission that he indicated the defense, likewise, if they put him in that group, alleges that he expressed doubts about the death penalty as well."
(R. 938-41.)
The reasons given by the prosecutor for striking Juror no. 57 were race neutral. "A veniremember's expression of reservations concerning the death penalty may be a valid race-neutral reason for striking a prospective juror." Burton v. State, 651 So.2d 641, 649 (Ala.Cr.App. 1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995). See also Carroll v. State, 599 So.2d 1253, 1258 (Ala.Cr.App. 1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 511 U.S. 1047, 114 S.Ct. 1582, 128 L.Ed.2d 224 (1994). The record reflects that Burgess's counsel acknowledged that Juror no. 57 had expressed reservations regarding the death penalty. (R. 930, 934, 948.) Further, given the facts of this case and Burgess's anticipated defense, the juror's comments about young people being "coerced" provided a valid race-neutral basis for exercising a peremptory strike against that juror. It was a specific and legitimate reason for striking the juror, and the reason was clearly related to the facts of the case. See Grimsley v. State, 678 So.2d 1197, 1201 (Ala.Cr.App.1996) (reasons related to the facts of the case that are not facially discriminatory do not violate Batson); Zumbado v. State, 615 So.2d 1223, 1232 (Ala.Cr.App.1993) (striking of prospective juror in a forgery case because she worked at a financial institution and prosecutor did not think that she would be a good juror was a race-neutral reason and was related to the facts of the case). It was reasonable for the prosecutor *575 to conclude, under the facts of this case, that Juror no. 57 might be sympathetic to Burgess, who was 16 years old when the murder occurred and who claimed that his alleged accomplices, who were older than he was, had planned the crime and had shot Gardner. See Thomas v. State, 555 So.2d 320, 322 (Ala.Cr.App. 1989) (striking jurors because they were single males did not violate Batson, under the facts of the case, because a single male might be sympathetic to the defendant, who had attempted to murder his girlfriend after she told him that she wanted to end their relationship).
Here, the state articulated race-neutral reasons for each peremptory strike it exercised against a black prospective juror. The burden then shifted to Burgess to offer evidence showing that those reasons were merely shams or pretextual. Burgess failed to show that the prosecutor's reasons were merely a sham or pretext. Thus, the trial court's decision denying Burgess's Batson motion was not "clearly erroneous."

VI.
Burgess contends that he was denied his right to a fair trial when the trial court introduced the parents of the victim, Kevin Gardner, to the jury venire before beginning the voir dire process. (Issue XIX in appellant's brief.) He specifically claims that by introducing Gardner's parents to prospective jurors, the trial court effectively suggested that the victim's parents were "parties to the litigation" and that jurors would be "ruling for or against the victim's parents." (Appellant's brief, pp. 84-85.) Burgess further maintains that the prejudicial effect of the trial court's actions was exacerbated when Gardner's parents were later allowed to sit at the prosecution's table during the trial. Because Burgess raised no objections at trial concerning these matters, we consider his claims on appeal under the plain error standard. Rule 45A, Ala.R.App.P.
The record reflects that the trial court introduced Gardner's parents to the jury venire just before beginning the voir dire process. At the same time, the trial court also introduced numerous other persons, including Burgess and his counsel, Burgess's parents, and counsel for the prosecution. The introduction of these individuals was followed by questions from the trial court as to whether any of the prospective jurors were related to any of the persons introduced. There was also later questioning from the attorneys as to whether any veniremember knew, or had had any involvement with, any of the persons introduced, including Gardner's parents.
Burgess's argument concerning the presence of the victim's parents at the prosecution's table has been addressed and rejected by this court. In Henderson v. State, 583 So.2d 276 (Ala.Cr.App.1990), aff'd 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992), this court stated:
"The presence of a victim seated at the counsel table for the prosecution is specifically provided for by `The Alabama Crime Victims' Court Attendance Act,' codified at §§ 15-14-50 et seq., Code of Alabama 1975. This act gives victims of a criminal offense the right to be present in the courtroom and seated alongside the prosecutor during the trial of the individual charged with that offense."
583 So.2d at 285-86.
Section 15-14-56(a), Ala.Code 1975, specifically provides:
"Whenever a victim is unable to attend such trial or hearing or any portion thereof by reason of death; disability; hardship, incapacity; physical, mental, or emotional condition; age; or other *576 inability, the victim, the victim's guardian or the victim's family may select a representative who shall be entitled to exercise any right granted to the victim, pursuant to the provisions of this article."
The right of the victim or the victim's representative to sit at the counsel table applies in both capital and noncapital cases. Coral v. State, 628 So.2d 954, 984 (Ala.Cr.App.), remanded on other grounds, aff'd on return to remand, 628 So.2d 988 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). Clearly, Gardner's parents had a right to be present in the courtroom and to sit at the prosecution's table during the trial of the person accused of murdering their son.
Because a victim or a member of a victim's family is entitled to sit at the prosecution's table during a trial, "[l]ogically, it would therefore follow that there is nothing wrong with introducing that person to the jury." Henderson, 583 So.2d at 286. See also Slaton v. State, 680 So.2d 879, 906 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997). As noted above, moreover, prospective jurors in Burgess's case were questioned during the voir dire examination, by both the trial court and the parties' attorneys, as to whether any of them were related to, knew, or had had any involvement with Gardner's parents. Introducing Gardner's parents to the venire gave prospective jurors an opportunity to see their faces, allowing them to provide better informed answers to the questions concerning whether they had any familiarity with Gardner's parents. This served Burgess by allowing him to strike any prospective jurors who, because of their familiarity with Gardner's parents, might be unduly sympathetic toward Gardner's family (and, by extension, the prosecution) or biased against Burgess. Accordingly, we conclude that no error, plain or otherwise, occurred when the trial court introduced Gardner's parents to the venire or when it allowed Gardner's parents to sit at the prosecution's table during the trial.

VII.
Burgess contends that the trial court erred in allowing testimony concerning collateral bad acts by Burgess. (Issue I in appellant's brief.)
State's witness Tommy Kyle testified that at around 11:00 p.m. on August 10, 1993, two days before Gardner's murder, he was at a Wal-Mart discount department store on Beltline Road in Decatur. Kyle stated that as he left the store, he saw Burgess, whom he knew from school, running across the store's parking lot. Kyle said to Burgess, "Hey, what's up?" and then proceeded to his car and began to put the items he had bought in the store in the backseat. When Kyle looked up, Burgess was standing by the driver's side of his car. Burgess asked Kyle for money. Kyle told Burgess that he had spent his money in Wal-Mart, and Burgess asked Kyle for some change for a soda. According to Kyle, when he told Burgess that he could give him some change, Burgess responded, saying, "I don't need any change; I need money." (R. 1187.) Kyle stated that Burgess then asked him for a ride home, but he declined to give Burgess a ride. Kyle stated that he and Burgess then talked briefly about some classmates before he told Burgess that he had to go. Burgess left Kyle and began to walk in the direction of the Wal-Mart. At that point, Kyle said, two police cars pulled into the Wal-Mart parking lot. Kyle stated that when Burgess saw the police cars, he turned around and walked quickly back toward Kyle's car and asked Kyle if he could get in his car. Kyle told him no. Then, according to Kyle, Burgess placed *577 underneath Kyle's car a jacket he had been carrying. Burgess stood next to Kyle's car and talked to Kyle as the police cars passed. Kyle again told Burgess that he had to go, and he got in his car and began to pull away. Burgess told Kyle to stop so he could get his jacket. Kyle testified that when Burgess picked up his jacket, he told Kyle that he had a gun he wanted to sell and he asked Kyle if he or anybody he knew wanted to buy a gun. Kyle stated that Burgess indicated that the gun was wrapped in his jacket. Kyle told Burgess that he did not want to buy a gun, and then drove away.
State's witness Roger Smith testified that at around 8:30 p.m. on August 12, 1993, the night of Gardner's murder, he was driving his "low rider" pickup truck, with his windows rolled down, around the mall on the Beltline Road in Decatur, when Burgess walked up to the passenger side of his truck, put his arm inside the window, and asked Smith for a ride. Burgess pointed to two men standing about 100 yards ahead in the parking lot, and then reached inside Smith's truck, unlocked the door, and got inside. Smith testified that he was not going to give Burgess a ride until Burgess indicated that he only wanted a ride to where the two men were standing. When Burgess got inside Smith's truck, he told Smith to turn up the stereo. Smith testified that Burgess kept looking toward the back of the truck to where the stereo system was located. When Smith reached the two men in the parking lot whom Burgess had pointed at, Burgess told him that he did not want to get out and he asked Smith to circle the mall. Smith testified that as he circled the mall, Burgess kept asking him for money, but he told Burgess he did not have any. When Smith asked Burgess where he wanted to go, Burgess told him to take him back to where Smith had picked him up.
State's witness John Bryant testified that at around 9:00 p.m. on the night of Gardner's murder, he was in his pickup truck driving his cousin around the mall on the Beltline Road in Decatur, when Burgess came running up to his truck and asked him for a ride to Wal-Mart. Bryant agreed to give Burgess a ride, and Burgess got in the truck. Bryant testified that as he was driving Burgess to Wal-Mart, Burgess pulled out a gun, pointed it in his and his cousin's direction, and asked them if they had any money. Bryant told Burgess that he did not have any money; his cousin told Burgess that he had $ 1.00, which he gave to Burgess. Bryant testified that the gun Burgess pointed at them was a small black pistol with a clip. He stated that just before they reached Wal-Mart, Burgess pulled the loaded clip out of the pistol and asked him if he or his cousin wanted to buy the pistol for $40. Bryant told Burgess again that he did not have any money. When Bryant arrived at Wal-Mart, Burgess got out of the truck and walked off.
Burgess argues on appeal that the testimony of Kyle, Smith, and Bryant should not have been admitted because, he says, it amounted to evidence of prior bad acts, it was not probative of any issue in the case, and it was offered solely to show his bad character or his propensity to commit criminal acts. He argues that through the witnesses' testimony, the state improperly sought to depict him to jurors as "a dangerous gun-toting criminal lurking in public places with only criminal intentions." (Appellant's brief, p. 6.)
The record reflects that Burgess filed a motion in limine seeking to prevent Kyle from testifying. That motion was denied, and Burgess objected to Kyle's testimony when it was offered at trial. The objection was overruled, and the trial court admitted Kyle's testimony without stating a reason *578 for overruling the objection. Burgess made no objections to the testimony of Smith or Bryant. Accordingly, we review Burgess's claims concerning the testimony of Smith and Bryant pursuant to the plain error standard. Rule 45A, Ala.R.App.P.
"On the trial for the alleged commission of a particular crime, evidence of the accused's having committed another act or crime is not admissible if the only probative function of such evidence is to prove bad character and the accused's conformity therewith. This is a general exclusionary rule which prevents the introduction of prior acts or crimes for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question....
". . . .
"The foregoing exclusionary rule does not work to exclude evidence of all crimes or acts, only such as are offered to show the defendant's bad character and conformity therewith on the occasion of the now-charged crime. If the defendant's commission of another crime or misdeed is relevant for some other material purpose in the case then it may be admitted."
C. Gamble, McElroy's Alabama Evidence, § 69.01(1) at 300-01 (5th ed.1996) (footnotes omitted).
"Evidence of collateral offenses may be admissible under certain exceptions to the exclusionary rule or for `other purposes' than to prove the accused's guilt." Williamson v. State, 629 So.2d 777, 780 (Ala.Cr.App.1993). In Nicks v. State, 521 So.2d 1018 (Ala.Cr.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988), this court discussed the exceptions to the general exclusionary rule:
"Numerous Alabama cases list the exceptions to the general exclusionary rule, or tests for relevancy, whereby evidence of collateral crimes or acts may be admitted. These exceptions include the following:
"`(1) Relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes.'

"Nelson v. State, 511 So.2d 225, 233 (Ala.Cr.App.1986). See also Twilley v. State, 472 So.2d 1130 (Ala.Cr.App.1985); Brewer v. State, [440 So.2d 1155 (Ala.Cr. App.), cert. denied, 440 So.2d 1155 (1983) ]; Miller v. State, 405 So.2d 41 (Ala.Cr.App.1981); Thompson v. State, 374 So.2d 377 (Ala.Cr.App.1978), aff'd, 374 So.2d 388 (Ala.1979); McMurtrey v. State, 37 Ala.App. 656, 74 So.2d 528 (1954); Wilkins v. State, 29 Ala.App. 349, 197 So. 75, cert. denied, 240 Ala. 52, 197 So. 81 (1940); McElroy's §§ 69.01(1)-(11); Schroeder, Evidentiary Use in Criminal Cases of Collateral Crimes and Acts: A Comparison of the Federal Rules and Alabama Law, 35 Ala.L.Rev. 241 (1984). All of the exceptions relate to the relevancy of the evidence, which means that evidence of separate and distinct crimes is admissible only when the evidence is relevant to the crime charged. Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); Noble v. State, 253 Ala. 519, 45 So.2d 857 (1950).
"`All evidence is relevant which throws, or tends to throw, any light upon the guilt or the innocence of the prisoner. And relevant evidence which is introduced to prove any material fact ought not to be rejected merely because it proves, or tends to prove, that at some other time or at *579 the same time the accused has been guilty of some other separate, independent and dissimilar crime. The general rule is well settled that all evidence must be relevant. If evidence is relevant upon the general issue of guilt, or innocence, no valid reason exists for its rejection merely because it may prove, or may tend to prove, that the accused committed some other crime, or may establish some collateral and unrelated fact. Evidence of other acts to be available must have some logical connection and reveal evidence of knowledge, design, plan, scheme, or conspiracy of the crime charged; or circumstantial evidence of identity of the person charged with the crime; or tends to corroborate direct evidence admitted.'
"Underhill, Criminal Evidence § 154 (3d ed.1923)."
521 So.2d at 1025-26. "`The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the State's case-in-chief rests within the sound discretion of the trial judge.'" Akin v. State, 698 So.2d 228, 234 (Ala.Cr.App. 1996), cert. denied, 698 So.2d 238 (Ala. 1997), quoting Blanco v. State, 515 So.2d 115, 120 (Ala.Cr.App.1987).
In Bradley v. State, 577 So.2d 541 (Ala. Cr.App.1990), this court stated:
"We have recognized that the list of traditionally recognized exceptions is not exhaustive and fixed. See Nicks v. State, 521 So.2d [1018] at 1025 [(Ala.Cr. App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988) ]. `It must ever be borne in mind that the state may prove the accused's commission of another crime if such other crime is relevant for any purpose other than that of showing his guilt through the medium of bad character.' C. Gamble, McElroy's Alabama Evidence § 69.0(1) (3d ed.1977) (quoting Mr. Justice McElroy, 2nd ed.)
"`In all instances, the question is whether the proposed evidence is primarily to prove the commission of another disconnected crime, or whether it is material to some issue in the case. If it is material and logically relevant to an issue in the case, whether to prove an element of the crime, or to controvert a material contention of defendant, it is not inadmissible because in making the proof the commission of an independent disconnected crime is an inseparable feature of it.'

"Snead v. State, 243 Ala. 23, 24, 8 So.2d 269, 270 (1942). However, even though evidence of collateral crimes or acts may be relevant to an issue other than the defendant's character, it should be excluded if `it would serve comparatively little or no purpose except to arouse the passion, prejudice, or sympathy of the jury,' Spellman v. State, 473 So.2d 618, 621 (Ala.Cr.App.1985), or put another way, `unless its probative value is "substantially outweighed by its undue prejudice,"' United States v. Stubbins, 877 F.2d 42, 43 (11th Cir.), cert. denied, 493 U.S. 940, 110 S.Ct. 340, 107 L.Ed.2d 328 (1989) (quoting United States v. Beechum, 582 F.2d 898 (5th Cir.1978) (en banc), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472(1979)).
". . . .
"Rather than uphold the trial court by straining to neatly fit the evidence of the three prior incidents into the narrow confines of the traditionally recognized categories, we have chosen to review the court's ruling by determining whether the evidence was `material and logically relevant' to an issue or issues in the case."
577 So.2d at 547-48.
We find that the testimony of Kyle, Smith, and Bryant was material and *580 logically relevant as to Burgess's motive to commit the charged crime. At trial, Burgess disavowed his statement to the police in which he had admitted that he shot Gardner, albeit accidentally, and claimed instead that Stevenson had shot Gardner. Burgess's theory of defense at trial was that it was his older accomplices, Stevenson and Jones, who conceived, organized, and carried out the plan to steal a car or a car stereo to make some money. In his trial testimony, Burgess suggested that Stevenson wanted to make some quick money and thus had the primary motive for carrying out the robbery of Gardner. Burgess testified that on the day of the murder, a man came to Stevenson and Jones's apartment and asked Stevenson to repay him money that Stevenson owed him. According to Burgess, Stevenson said that he would have to steal a car to get the money to repay the man. Both in his statement to police and at trial, Burgess maintained that he had asked Gardner for a ride on the night of the murder only because he wanted to go to the apartment on Graymont Lane to pick up some clothes and food he had left there earlier that day. Burgess also claimed that he was concerned that Stevenson and Jones intended to rob Gardner and that he had even warned Gardner that Stevenson and Jones were going to rob him.
Burgess's trial counsel sought to portray Stevenson and Jones and their roommates, Kevin Matthews and Will Hatton, all of whom, with the exception of Hatton, were unemployed, as thieves without legitimate sources of income, who supported themselves by committing crimes. During closing arguments, Burgess's counsel argued to the jury:
"Four people lived there [at the apartment on Graymont Lane]. One had a meager job and the other three had no jobs. They did not get SSI [Supplemental Security Income], they did not get unemployment, they did not get anything legitimate in the way of income for all four of them to live except for the paycheck which was minimum wage for being a cook at Domino's Pizza. How do you reckon they were supporting themselves? How do you reckon Demetrius Stevenson was able to eat, to buy alcohol, to have the things that he wanted? What was going on among the four people in that apartment because when Roy Burgess goes over there, what is going on? A great debate. The great debate is `Should we break into cars and steal stereos or should we steal the whole car? What is the merit of each position?' That was the evidence. Now, who was in favor of stealing a car Demetrius Stevenson. Who knew where the chop shop was in Birmingham Demetrius Stevenson. Well, Roy sits there for a while and he enters into the discussion and he never should have."
(R. 2200-01.)
In contrast to the picture that Burgess's counsel painted of Burgess's alleged accomplices, trial counsel depicted Burgess in a favorable light, repeatedly bringing to the jury's attention that Burgess lived at home with his parents and that Burgess's family was a middle-class family who lived in a good neighborhood. Counsel also made much of the fact that Burgess was the youngest in the group of men that included his alleged accomplices, portraying Burgess as a somewhat guileless teenager, who got caught up in the robbery and murder only because he lacked maturity and had succumbed to peer pressure from his older, lawbreaking friends.
The testimony of Kyle, Smith, and Bryant tended to show that around the date of the murder, Burgess himself was looking to make some quick money, and thus tended to show that Burgess had a motive, as strong as the motive imputed to *581 Stevenson by Burgess's defense, for carrying out the robbery that ended with Gardner's murder. As this court stated in Bradley:
"`If a crime is clearly shown to have been committed by the accused, as in the case of one intentionally and without cause striking a deadly blow with an ax, the question of motive would be of little importance. But where the direct evidence is in conflict as to whether the accused did the act, or is partially or wholly circumstantial upon that issue, the question of motive becomes a leading inquiry.'

"Fuller v. State, 269 Ala. 312, 113 So.2d 153, 175 (1959), cert. denied, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960) (quoting Harden v. State, 211 Ala. 656, 101 So. 442, 444 (1924)). `It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.' Bowden v. State, 538 So.2d 1226, 1235 (Ala.1988) (quoting earlier cases, emphasis in Bowden)."
577 So.2d at 549. The witnesses' testimony tended to show that, contrary to Burgess's defense, Burgess was looking for money and for potential victims on the night of the murder.
The testimony of Kyle, Smith, and Bryant was also relevant as tending to corroborate the testimony of Burgess's alleged accomplices, Stevenson and Jones, that Burgess came to their apartment on the day of the murder complaining that he needed money and then told them about his plan to make some money by robbing someone or by stealing a car or a car stereo. Bryant's testimony in particular tended to corroborate the testimony of Stevenson and Jones that Burgess returned to the apartment on the night of the murder and told them that the people in a truck he had gotten into had given him a dollar but that they "didn't have anything." Furthermore, the similarities between the charged offense and prior acts tended to show that Burgess was carrying out his plan on the night of the murder. All of the incidents Kyle, Smith, and Bryant testified to occurred within two days of Gardner's murder; all of the incidents involved Burgess's approaching persons and asking for a ride, as Burgess did with Gardner; and all of the incidents took place in the same area of Decatur where Burgess initially encountered Gardner and, under the state's theory of the case, from which he lured Gardner under the false pretense of needing a ride to his friends' apartment. Burgess's alleged accomplices were not with him during any of the three incidents, nor were they with him when he initially encountered Gardner. The witnesses' testimony also tended to show that Burgess was in possession of a gun around the time of the murder.
The testimony of Kyle, Smith, and Bryant was not probative only to show Burgess's bad character or that Burgess had acted in conformity with that bad character. Moreover, the probative value of the evidence clearly outweighed its prejudicial effect. Accordingly, there was no error, plain or otherwise, in the trial court's admission of the testimony.

VIII.
Burgess contends that he was denied his right to a fair trial by what he says was the state's failure to timely disclose an inculpatory statement he allegedly made to Roderick Reynolds while he was being held in the same juvenile detention facility as Reynolds. (Issue II in appellant's brief.)
During trial on Monday, October 24, 1993, the state called Reynolds as a witness. At that point, Burgess's counsel requested a sidebar conference to inquire *582 into the nature of Reynolds's expected testimony. In the sidebar discussion, the prosecutor proffered that Reynolds was expected to testify that while he was being held in the same juvenile detention facility as Burgess, Burgess had told him that he had killed a "white boy" and that he had left the boy's body in some bushes in the Cedar Lake area of Decatur. The prosecutor told the trial court that his office had had no knowledge of Reynolds as a potential witness before the start of Burgess's trial. The prosecutor further stated that at some point after the trial had commenced, a private citizen had notified the police that Burgess had made an inculpatory statement to Reynolds. According to the prosecutor, the police then spent several days attempting to find Reynolds; they located him on Saturday, October 22. The prosecutor stated that after Burgess's trial had recessed on the afternoon of October 22, he was notified by the police that they had located Reynolds. However, he said, his office's first actual contact with Reynolds was not until court had reconvened on Monday, October 24, only 15 minutes before the state called Reynolds to testify. Burgess's counsel moved to bar Reynolds's testimony on the ground that the defense had no prior knowledge of Reynolds or of his anticipated testimony. (R. 1694.) The trial court denied the motion and recessed for lunch.
During the lunch recess, Burgess's counsel attempted to interview Reynolds, but Reynolds refused to talk to counsel. When court reconvened, the parties again discussed the matter of Reynolds's testimony. Burgess's counsel moved for a continuance on the ground that the defense needed time to investigate Reynolds for any possible bias against Burgess. Burgess's counsel alternatively requested that in the event the motion for a continuance was denied and Reynolds was allowed to testify, that the defense be furnished with Reynolds's prior criminal history for impeachment purposes. Burgess's counsel further argued that the state's disclosure of the inculpatory statement Burgess was alleged to have made to Reynolds was untimely, in violation, counsel argued, of both Rule 16, Ala.R.Crim.P., and the pretrial discovery order that had been entered by the trial court.
The trial court held that Burgess's alleged statement to Reynolds was not discoverable under Rule 16, Ala.R.Crim.P., and that there had been no attempt by the state to conceal the statement from the defense in violation of its discovery order. The trial court further found:
"It would appear to me that there has been no unfairness, no activity by the State to be unfair or show any bad faith and the Court is attempting to perform its duty to make that determination. I think one point here is that the State could not disclose something that it did not have, and though the State had some information that it might have a potential witness's testimony on Saturday, that determination was really not made until this date. I find no violation in the Monk [Ex parte Monk, 557 So.2d 832 (Ala.1989) ] or Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ] rules. I do think that the defense is entitled for possible impeachment purposes to have a records check and that's what I think we can have at this time."
(R. 1712.)
The trial court then informed the parties that during the lunch recess, it had ordered the clerks of the juvenile, district, and circuit courts to search their records for any information on Reynolds's criminal history. The record reflects that Burgess's counsel was subsequently furnished with Reynolds's juvenile records, which included adjudications of delinquency for breaking and entering a vehicle and for *583 providing false information to a police officer after being arrested for another offense. When Reynolds was later allowed to testify, Burgess's counsel used Reynolds's juvenile adjudications as impeachment material during cross-examination.
On appeal, Burgess argues that under Rule 16.1(a), Ala.R.Crim.P., the defense is entitled to any inculpatory statement made by a defendant that is within the state's possession. However, this is an incorrect statement of the law. Rule 16.1(a) does not require the prosecution to disclose every inculpatory statement, written or oral, made by a defendant. Instead, Rule 16.1(a)(1) provides, in part, that upon written request of the defendant, the prosecutor shall "[p]ermit the defendant to inspect and to copy any written or recorded statements made by the defendant to any law enforcement officer, official, or employee which are within the possession, custody, or control of the state/municipality, the existence of which is known to the prosecutor." (Emphasis added.) Rule 16.1(a)(2) further provides that the prosecutor shall also "[d]isclose the substance of any oral statements made by the defendant, before or after arrest, to any law enforcement officer, official, or employee which the state/municipality intends to offer in evidence at the trial." (Emphasis added.) Reynolds was not a law enforcement officer, official, or employee; thus, the statement at issue does not fall within the purview of Rule 16.1(a), Ala.R.Crim.P.
Accordingly, in order to determine whether a discovery violation occurred, we must look to the discovery order entered by the trial court in Burgess's case. Campbell v. State, 570 So.2d 1276, 1279 (Ala.Cr.App.1990). The record reveals that the discovery order entered by the trial court substantially tracked the language of Rule 16, Ala.R.Crim.P. (C. 280-83.) Thus, the prosecution did not violate the trial court's discovery order by failing to disclose Burgess's statement to Reynolds any sooner than it did.
However, even assuming that the prosecution violated the trial court's discovery order by failing to disclose the statement in a timely manner, it would not require reversal. This court has held that not every discovery violation merits a reversal. Smith v. State, 698 So.2d 189, 206 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997). Rule 16.5, Ala.R.Crim.P., "clearly places the remedy for violations within the sound discretion of the trial court, and to support a claim for reversal of the exercise of that discretion, the accused must show prejudice to substantial rights." Smith, 698 So.2d at 206-07. Here, Burgess has failed to show that disclosure of the oral statement on Saturday, October 22the earliest date upon which Burgess's alleged statement to Reynolds was arguably in the prosecution's possessionas opposed to Monday, October 24, would have affected the outcome of his case. See DeBruce v. State, 651 So.2d 599, 622 (Ala.Cr.App.1993), aff'd. 651 So.2d 624 (Ala.1994); and Smith v. State, 639 So.2d 543, 547 (Ala.Cr.App. 1993).
The actions of the trial court were more than adequate to ensure that Burgess would not be prejudiced by the late disclosure of Reynolds's testimony. See Minnis v. State, 690 So.2d 521, 527 (Ala.Cr.App. 1996). Burgess's counsel was given an opportunity to talk to Reynolds during the recess in the proceedings and was also provided with records of Reynolds's juvenile adjudications, which counsel used as impeachment material during the crossexamination of Reynolds. Burgess's counsel also brought out during Reynolds's cross-examination that Burgess's alleged accomplice Demetrius Stevenson (who Burgess claimed at trial had shot Gardner) *584 was Reynolds's cousin. In addition, Burgess's counsel was able to seek to discredit Reynolds's testimony by calling as a witness another juvenile who had been held in the same juvenile detention facility with Burgess and Reynolds. The juvenile testified that while in the detention facility, he overheard Reynolds making a telephone call to Stevenson in regard to Gardner's murder.
Burgess has failed to show that he was denied his right to a fair trial as a result of Reynolds's being allowed to testify.

IX.
Burgess contends that the trial court erred in denying his motion to suppress his post-arrest statement to the police because, he says, the statement was not given knowingly, voluntarily, and intelligently. (Issue IX in appellant's brief.)
"It is well settled in this state that an extrajudicial statement is presumed to be involuntary and is inadmissible at trial unless the State presents sufficient evidence to show that the statement was in fact voluntary and that the proper Miranda[[2]] warnings were given. Ex parte Johnson, 522 So.2d 234 (Ala.1988); Crowe v. State, 485 So.2d 351 (Ala.Cr. App.1984), reversed on other grounds, 485 So.2d 373 (Ala.1985). When the State seeks the admission of the statement of a juvenile, the State must show that the juvenile was advised of his rights under Rule 11(A) [now, Rule 11(B) ], A.R.Juv.P., rather than the standard Miranda rights of which adults are advised. See Ex parte Whisenant, 466 So.2d 1006 (Ala.1985); Scott v. State, 501 So.2d 1273 (Ala.Cr.App.1986). Rule 11(A) contains the basic Miranda warnings, plus the additional information that the juvenile has the `right to communicate with [his counsel, parent, or guardian if they are not present], and that, if necessary, reasonable means will be provided for him to do so.' Rule 11(A)(4), A.R.Juv.P. See Ex parte Whisenant, supra.
". . . .
"The United States Supreme Court has specifically held that the `totality of the circumstances' test is applicable when determining the admissibility of a juvenile's confession:
"`This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits indeed it mandatesinquiry into all circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warning given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.'

"Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979) (quoted in Chambers v. State, 497 So.2d 607, 609-10 (Ala.Cr.App.1986); Jackson v. State, 516 So.2d 726, 745 (Ala.Cr.App.1985)). See also Scott v. State, 501 So.2d at 1274; Whisenant v. State, 466 So.2d 995, 1000 (Ala.Cr.App. 1984), reversed on other grounds, 466 So.2d 1006 (Ala.1985)."
Carr v. State, 545 So.2d 820, 822 (Ala.Cr. App.1989).
The Alabama Supreme Court has stated:

*585 "In determining whether a confession is voluntary, the trial court's finding of voluntariness need only be supported by a preponderance of the evidence. Seawright v. State, 479 So.2d 1362, 1367 (Ala.Cr.App.1985). The trial court's decision will not be disturbed on appeal unless it is manifestly contrary to the great weight of the evidence. `"The test for the voluntary nature of an extrajudicial confession or inculpatory statement is whether in light of all the surrounding circumstances, the statement was free from inducement, threat or promise, either expressed or implied, which would have produced in the mind of the accused any fear of harm or hope of favor."' Seawright, 479 So.2d at 1367, citing Rogers v. State, 365 So.2d 322 (Ala.Cr.App.[(1978)])."
Dixon v. State, 588 So.2d 903, 907 (Ala. 1991), cert. denied, 502 U.S. 1044, 112 S.Ct. 904, 116 L.Ed.2d 805 (1992). Whether a waiver of Miranda rights is knowing and intelligent depends on the facts of each case, considering the totality of the circumstances surrounding the interrogation, which includes the characteristics of the accused, the conditions of the interrogation, and the conduct of the law enforcement officials. Staten v. State, 547 So.2d 603 (Ala.Cr.App.1988), rev'd on other grounds, 547 So.2d 607 (Ala.1989); Moore v. State, 415 So.2d 1210 (Ala.Cr.App.), cert. denied, 459 U.S. 1041, 103 S.Ct. 459, 74 L.Ed.2d 610 (1982).
At the suppression hearing, Investigator Nadis Carlisle of the Decatur Police Department testified that at approximately 12:40 a.m. on August 16, 1993, he and several other law enforcement officers, including Sergeant John Bradford, went to Burgess's house with a petition for his arrest. (R. 1740.) Carlisle stated that Bradford knocked on the front door and that Burgess answered. According to Carlisle, Bradford told Burgess that he needed to wake his parents because the officers needed to talk to them as well as to Burgess. (R. 1741.) Burgess closed the door; when, after some time, neither he nor his parents returned to the door, the officers knocked again. Carlisle testified that Burgess's brother then answered the door and allowed the officers inside the house. (R. 1742.) Carlisle then advised Burgess that he was under arrest for murder. (R. 1743.) At that point, according to Carlisle, Burgess's father, who had apparently been awakened after the officers' arrival, became very upset. Carlisle stated that he then informed Burgess's father that Burgess was being taken to the police station and that he could come as well. (R. 1744.) Carlisle testified that before leaving Burgess's house, Burgess was informed of his right to remain silent; however, he said that Burgess was not fully advised of his juvenile Miranda rights until he was at the police station.
At the police station, Burgess was placed in an interview room in the detective division, where Carlisle and Bradford informed him that he was under arrest for murder and that he was possibly facing a capital murder charge, which, if he was certified to stand trial as an adult, could carry a sentence of death. (R. 1745-46, 1769.) Carlisle testified that while he was explaining this to Burgess, he heard a police officer at the front desk in the detective division engaged in a loud conversation with Burgess's father. (R. 1746.) Carlisle left Burgess with Bradford in the interview room and went to the front desk to talk to Burgess's parents. (R. 1746, 1747.) After Carlisle explained matters to Burgess's parents, Burgess's father told Carlisle that he wanted to be with his son during any questioning. (R. 1747.) Carlisle stated that he then returned to the interview room where Burgess was being held and told Burgess that his father and mother were at the police station and that they wanted to be with him. (R. 1748.) *586 According to Carlisle, Burgess initially indicated that he was uncertain whether he wanted his parents with him, asking the officers whether they thought that it was a good idea to have them there while he was being questioned. (R. 1748.) Carlisle testified that he told Burgess that he thought he might want to have his parents with him during questioning. (R. 1748-49.) Burgess's father was then brought into the interview room.
Carlisle testified that once Burgess's father was present in the interview room, Bradford read Burgess his juvenile Miranda rights from a preprinted form. (R. 1749.) According to Carlisle, both Burgess and Burgess's father were allowed to read the form, and both indicated that they understood its contents. (R. 1751.) Carlisle stated that Burgess told the officers that he wanted to waive his rights and give a statement. (R. 1752.) Burgess then signed the waiver form, as did his father and the two officers. (R. 1752-53.)
Carlisle testified that Burgess was not questioned until after he had been advised of his juvenile Miranda rights and had signed the waiver form. (R. 1773.) After talking to the officers for approximately an hour and 10 minutes with his father present, Burgess gave an oral statement that Carlisle reduced to writing. (R. 1756.) In his statement, Burgess admitted that he had shot Gardner, although he claimed the shooting was accidental. Carlisle testified that Burgess was not threatened or coerced into signing the waiver form or giving the statement, and that he was not offered any reward or hope of reward for his cooperation. (R. 1752, 1757.) After Burgess's statement was reduced to writing, it was given to Burgess and his father to read. According to Carlisle, both Burgess and his father appeared to read the statement, and both acknowledged that it was accurate. (R. 1759.) However, Carlisle said, on the advice of his father, Burgess did not sign the statement. (R. 1759.)
Burgess's father testified at the suppression hearing. He acknowledged that his son was read his rights and that his son waived those rights before giving the statement. (R. 1792, 1796.) He further testified that the police did not threaten or pressure his son into waiving his rights or giving the statement. (R. 1796.) He stated that while he was with Burgess in the interview room, Burgess was not promised anything in return for giving a statement. (R. 1796.) He stated that he told Burgess to tell the truth if he chose to answer the officers' questions. (R. 1791, 1799.) He stated that Burgess did not sign the statement after it was reduced to writing because he had advised him not to. (R. 1798.) According to Burgess's father, the day after Burgess gave his statement to the police, Burgess told him that the statement was not the truth and that he did not shoot Gardner. (R. 1795.)
Sergeant John Bradford's testimony was consistent with that of Investigator Carlisle. In addition, Bradford testified concerning the period he was alone with Burgess in the interview room while Carlisle was talking to Burgess's parents at the front desk in the detective division. Bradford stated that while he was alone with Burgess, he did not talk to Burgess about giving a statement, and that he did not threaten or coerce Burgess into giving a statement or promise him anything for cooperating. (R. 1810-11.) Bradford testified that the only discussion he had with Burgess when they were alone in the interview room was when he explained to Burgess that the officers were trying to get one of his parents to be present with him during questioning. (R. 1810.)
Burgess testified at the suppression hearing and maintained that Carlisle and Bradford had questioned him before he *587 was advised of his rights. (R. 1830, 1834-35.) He further maintained that the officers had told him that if he told the truth, they would do all they could to help him, but that if he lied, they would see to it that he was certified to be tried as an adult. (R. 1835, 1837.) Burgess testified that his statement to the officers admitting that he had shot Gardner was not the truth. (R. 1848.)
At the suppression hearing, Burgess stated that he told the officers that he had shot Gardner only because he was afraid of his alleged accomplices, whom, he maintained, he could see through the window of the detective division interview room "throwing up them gang signs." (R. 1841.) However, when testifying before the jury, Burgess stated that he had admitted to shooting Gardner only because he thought Carlisle and Bradford would help him by preventing his being tried as an adult. (R.2028, 2032.)
The trial court found that Burgess gave his statement to the police voluntarily, after he had been properly informed of his Miranda rights, and that he knowingly waived those rights. On appeal, Burgess insists that his statement was not voluntary because, he says, he was physically exhausted and under emotional strain when he gave the statement; he had been arrested in the middle of the night and taken from his home to the police station without an opportunity to get fully dressed; and the interrogating officers threatened that he would be certified as an adult if he did not give a statement. Because these claims were not specifically presented to the trial court (see R. 1856-62), we review them under the plain error standard. Rule 45A, Ala.R.App.P.
Whether Burgess was, as he claims, physically exhausted and under emotional strain when he gave his statement was merely one factor to be considered by the trier of fact in determining the credibility and weight to afford Burgess's statement. There was no testimony from the interrogating officers that Burgess appeared to be exhausted or emotionally distressed to the point of being unable to voluntarily waive his rights and give a statement. A certain amount of stress, nervousness, and emotion is to be expected in an individual who has been arrested for murder; it certainly is not a basis for finding inadmissible an otherwise voluntary statement. See Callahan v. State, 557 So.2d 1292, 1300 (Ala.Cr.App.1989), aff'd, 557 So.2d 1311 (Ala.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 216, 112 L.Ed.2d 176 (1990). Further, the mere fact that a juvenile defendant is not questioned until a late hour is not necessarily a coercive factor that renders the statement involuntary. See Jackson v. State, 674 So.2d 1318, 1327 (Ala.Cr.App.1993), aff'd in relevant part, 674 So.2d 1365 (Ala.1994), aff'd on return to remand, 674 So.2d 1370 (Ala.Cr.App.1995).
Burgess's claim on appeal that his statement was coerced by a threat from the interrogating officers that he would be certified as an adult if he did not give a statement conflicts not only with the testimony of the interrogating officers, but also with Burgess's own testimony at the suppression hearing. At the hearing, Burgess stated that he gave the inculpatory statement only because he was afraid of his alleged accomplices, who he said were "throwing up" gang signs to him as he was being held in the interview room at the police station. The officers testified that they did not threaten or coerce Burgess into giving the statement; that they never told Burgess that he would be certified as an adult if he did not give a statement; and that they merely informed Burgess of the fact that if he was certified to stand trial as an adult, he could face a capital *588 murder charge and a possible death sentence.
"`"Absent clear error, the [circuit] court's credibility choices at suppression hearings are binding on this court." Walker v. State, 551 So.2d 449, 451 (Ala. Cr.App.1989). The standard on review of conflicting evidence at a motion to suppress a confession is whether the trial court's finding was "manifestly contrary to the great weight of the evidence." Ex parte Matthews, 601 So.2d 52 (Ala.1992), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992).'"
D.M.M. v. State, 647 So.2d 57, 61 (Ala.Cr. App.1994), quoting Thompson v. State, 611 So.2d 476, 478 (Ala.Cr.App.1992). See also Barbour v. State, 673 So.2d 461, 467 (Ala. Cr.App.1994), aff'd, 673 So.2d 473 (Ala. 1995). The testimony of Carlisle and Bradford indicated that any comments by the officers to Burgess concerning certification as an adult were intended to apprise Burgess of his legal situation and the penalties he could face.
"`A truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will. Such an account may increase the chance that one detained will make a statement. However, as long as the statement results from an informed and intelligent apprisal of the risks involved rather than a coercive atmosphere, the statement may be considered to have been voluntarily made.'"
Stewart v. State, 562 So.2d 1365, 1372-73 (Ala.Cr.App.1989), quoting United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir. 1978). See Thomas v. State, 531 So.2d 45, 47-49 (Ala.Cr.App.1988).
Here, if the trial court gave more credit to the testimony of the officers than it did to Burgess's testimony, it could reasonably conclude, under the totality of the circumstances, that Burgess gave his statement after he was advised of his juvenile Miranda rights, see Rule 11(B), A.R.Juv.P., that he had knowingly waived those rights, and that his statement was not induced by any threat, coercion, or hope of reward. "Where a trial judge determines, on conflicting evidence, that a confession has been voluntarily made, such a finding will not be disturbed on appeal unless it is palpably contrary to the great weight of the evidence." Thomas, 531 So.2d at 49. We do not find the trial court's determination of voluntariness to be palpably contrary to the great weight of the evidence. The trial court did not err in denying Burgess's motion to suppress his statement and in admitting the statement at trial.

X.
Burgess contends that his Fourth Amendment rights were violated when the trial court allowed the state to introduce evidence of certain items that police found in his bedroom at his parents' house because, he says, those items were found as the result of an illegal search and seizure. (Issue XVIII in appellant's brief.)
The record reflects that sometime after Burgess had been arrested and had given police a statement admitting that he had shot Gardner, Sergeant John Boyd of the Decatur Police Department told Burgess's mother, who was present at the police station, that the police believed that certain items taken from Gardner's car after the shooting might be in Burgess's bedroom in his parents' house. Boyd testified that Burgess's mother agreed to take him to her house. Burgess's mother told Boyd to follow her to her house in his car. Once they arrived at the house, Burgess's mother invited Boyd inside. She then went to Burgess's bedroom, gathered up several items, and turned them over to Boyd, who *589 was standing at the entrance to Burgess's bedroom. Boyd testified that after Burgess's mother handed him these items, he thanked her and proceeded to leave. At that point, Boyd said, Burgess's mother told him to wait a moment, and then went back into Burgess's bedroom and retrieved several more items, which she also gave to Boyd. The items that Burgess's mother gave to Boyd included several compact discs and a portable compact disc player, which were later identified as having belonged to Gardner.
On appeal, Burgess argues that in retrieving the items from his bedroom and giving them to the police after being asked to do so by the police, his mother was acting as an "agent" of the police. He maintains that this alleged agency relationship between his mother and the police resulted in an illegal search and seizure and that, therefore, the items belonging to Gardner should not have been admitted into evidence at trial. Burgess alternatively argues that even if his mother was not acting as an agent of the police, she did not have authority to consent to a search of his bedroom. The record reveals that Burgess's only objection at trial to the admission of the items found in his bedroom was on grounds that the items could not have been lawfully obtained from his room without his consent or without a search warrant and that his mother could not waive his constitutional rights by consenting to the search. (R. 1631-32.) Therefore, Burgess's claim on appeal that his mother was acting as an agent of the police in retrieving the items from his bedroom and giving them to the police must be reviewed pursuant to the plain error standard. Rule 45A, Ala.R.App.P.
This court has recognized:
"`"Consent searches are part of the standard investigatory techniques of law enforcement agencies. They normally occur on the highway, or in a person's home or office, and under informal and unstructured conditions. The circumstances that prompt the initial request to search may develop quickly or be a logical extension of investigative police questioning. The police may seek to investigate further suspicious circumstances or to follow up leads developed in questioning persons at the scene of a crime."'"
Tillman v. State, 647 So.2d 7, 10 (Ala.Cr. App.1994), quoting Ball v. State, 592 So.2d 1071, 1073 (Ala.Cr.App.1991).
In the present case, the undisputed evidence reflected that upon a request by Boyd, Burgess's mother agreed to search Burgess's bedroom for items belonging to Gardner. There was "no hint of duress or coercion." See Tillman, 647 So.2d at 10. Boyd simply made the request, and Burgess's mother consented to it. To hold that one's agreement to search a room in one's own house under circumstances such as these creates an improper "agency" relationship with the police "would essentially do away with valid consent searches." See Tillman, 647 So.2d at 10.
Burgess's contention that his mother did not have authority to consent to a search of his bedroom is likewise without merit. As this court stated in Taylor v. State, 491 So.2d 1042 (Ala.Cr.App.1986):
"`[T]he parent's rights are "superior to the rights of children who live in the house," which means ... that the parent's consent would be effective even when the child was present and objecting.' W. LaFave, 2 Search and Seizure § 8.4 (1978). `Even if a minor child, living in the bosom of his family, may think of a room as "his," the overall dominance will be in his parents.' United States v. Di Prima, 472 F.2d 550, 551 (1st Cir.1973)."

*590 "`If a son or daughter, whether or not still a minor, is residing in the home of the parents, generally it is within the authority of the father or mother to consent to a police search of that home which will be effective against the offspring. This is unquestionably so as to areas of common usage, and is also true of the bedroom of the son or daughter when a parent has ready access for purposes of cleaning it or when because of the minority of the offspring the parent is still exercising parental authority. Because in the latter circumstances the parent's rights are "superior to the rights of children who live in the house," a parent's consent would prevail even if the child were present and objecting and even if the child had taken special measures in an effort to ensure he had exclusive use of the area searched.' W. LaFave, 1 Criminal Procedure § 3.10(e) (1984)."
491 So.2d at 1045.
Burgess was 16 years old and living in his parents' house at the time his mother agreed to search his bedroom for the items belonging to Gardner. His mother's rights were superior to his. Thus, even if Burgess had been "standing there objecting to the search ... the consent given by [his mother] prevails, and thus the search was proper." See Taylor, 491 So.2d at 1045. Accordingly, we find no Fourth Amendment violation. The trial court properly allowed the state to introduce the items that Burgess's mother retrieved from his bedroom.

XI.
Burgess contends that he was denied his right to a fair trial when the trial court admitted into evidence photographs of Gardner's body as it was found at the crime scene, a videotape of the crime scene, and photographic slides of Gardner's autopsy. (Issue XIII in appellant's brief.) He argues that this evidence had no probative value and that it was introduced by the state solely to inflame the jury.
"Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App.1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App.1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App.1984)."
Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim's injuries. See *591 Dabbs v. State, 518 So.2d 825, 829 (Ala.Cr. App.1987).
In explaining its ruling allowing the state to introduce the photographs, videotape, and slides, the trial court stated:
"I have not stated my reasons for permitting the State to show the video and a number of photographs and slides which depict the wound that the victim suffered. Should this case be reviewed, I think perhaps for the benefit of the reviewing Court, I should offer some explanation for my ruling. The defense has made several objections as to the cumulative nature and graphic nature of the photograph exhibits and slides and video. For the most part, the photographs and the video and the slides lack an excessive amount of blood and none have shown internal views of the wound or exposed internal organs. While I do conclude that some of these pictures may be somewhat cumulative, I believe that the probative value of the evidence outweighs any prejudice which may arise from the repetitive qualities of some of the photographs or slides. In making my determination, I note that the defense put in issue the location of the entry wound in question. In opening statements it was mentioned by the defense, or at least implied, that the shot was fired from the rear seat of the automobile rather than the passenger seat as the State alleges here, or an area of the passenger seat. It is my view that the photographs, slides and video may be helpful to the jury in resolving that issue."
(R. 2182-83.)
The record reflects that before admission of the complained-of evidence, and later during the trial court's oral charge, the trial court instructed the jurors that they should not allow their feelings about the disturbing nature of the photographs, videotape, and slides to influence their deliberations on the question of Burgess's guilt or innocence. The trial court further instructed jurors that the evidence was to be considered only for the purpose of resolving material issues of fact.
Here, the photographs, the videotape, and the slides in question depicted matters that were relevant and material to the issues in Burgess's case and corroborated the trial testimony. As the trial court pointed out, Burgess himself placed the entry and location of Gardner's gunshot wound in issue at the trial. Sergeant John Boyd, who took the photographs, and Sergeant Johnny Coker, who made the videotape, each testified that the photographs and the videotape substantially and accurately depicted Gardner's body as police had found it at the crime scene. Dr. Kenneth Warner, who performed the autopsy on Gardner, testified that the slides taken during the autopsy accurately depicted Gardner and the injuries Gardner sustained.
In his brief to this court, Burgess specifically refers to the unpleasant nature of State's Exhibit 28, a photograph of Gardner's body at the crime scene showing a close-up view of the gunshot wound to Gardner's right ear. The photograph also shows that the wound was infested with insects and that some insect eggs had been deposited on Gardner's body. When Burgess objected to the introduction of this photograph at trial, the prosecutor argued that although it was unfortunate that the photograph revealed the insects on Gardner's body, the photograph accurately depicted the condition in which Gardner's body was found.
"The fact that a photograph is gruesome and ghastly is no reason to exclude it from the evidence, so long as the photograph has some relevancy to the proceedings, even if the photograph may tend to inflame the jury." Bankhead v. State, *592 585 So.2d 97, 109-10 (Ala.Cr.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd. on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992), rev'd, 625 So.2d 1146 (Ala.1993). The photograph in question showed the location of the gunshot wound to Gardner's ear, an issue raised by Burgess's counsel in his opening arguments. Thus, the photograph tended to shed light on some relevant fact in the case.
In Jenkins v. State, 627 So.2d 1034 (Ala. Cr.App.1992), aff'd, 627 So.2d 1054 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994), this court stated:
"The state had the burden of proving that the victim was dead, and this photograph was direct evidence on that point. Perpetrators of crimes that result in gruesome scenes have reason to expect that photographs of those gruesome scenes will be taken and admitted into evidence."
627 So.2d at 1045. Gardner was shot in the head, and his body was left in the woods. "There is irony in a convicted murderer's contending on appeal that pictures of the corpse of his victim might have inflamed the jury. That risk `comes with the territory.'" Grice v. State, 527 So.2d 784, 787 (Ala.Cr.App.1988). We conclude that admission of the photographs, videotape, and slides did not deny Burgess his right to a fair trial.

XII.
Burgess contends that the state failed to present evidence sufficient to corroborate the testimony of Demetrius Stevenson and Richie Jones, who, Burgess says, were his accomplices in the capital murder. (Issue XIV in appellant's brief.) This issue is presented for the first time on appeal; thus, our review is for plain error. Rule 45A, Ala.R.App.P.
Section 12-21-222, Ala.Code 1975, provides:
"A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
Initially we note that, contrary to Burgess's suggestion on appeal, Stevenson and Jones were not "clearly" his accomplices in the capital murder, as a matter of law. Whether a witness is an accomplice may be a question of law or fact, depending upon the circumstances of the case. See Ex parte Bankhead, 585 So.2d 112, 119 (Ala.1991). "When there is a doubt or dispute concerning the complicity of a witness and the testimony is susceptible to different inferences on that point, the question [of whether the witness is an accomplice] is for the jury." Id.
The evidence showed that Stevenson and Jones were present with Burgess in Gardner's car when Gardner was shot. Although both Stevenson and Jones admitted that earlier on the day of the murder, they had discussed stealing a car or a car stereo, and further admitted that they stole the stereo from Gardner's car several hours after the murder was committed, both men testified that they had no prior knowledge of Burgess's intention to rob and murder Gardner, and both testified that they did not participate in the robbery or murder. Both witnesses testified that when they left their apartment with Burgess and Gardner in Gardner's car, they believed Gardner was taking them to a party. "When a witness denies willing participation in the crime charged against the defendant, the issue of his being an accomplice is a question of fact for the *593 jury." Ex parte Bankhead, 585 So.2d at 119. Therefore, it was for the jury to determine whether Stevenson and Jones were Burgess's accomplices in the capital murder and whether the state had presented sufficient evidence to corroborate their testimony.
Even assuming, for the sake of argument, that both Stevenson and Jones were Burgess's accomplices, there was sufficient corroborating evidence to support their testimony, as required by § 12-21-222, Ala.Code 1975. In Chevere v. State, 607 So.2d 361 (Ala.Cr.App.1992), this court stated:
"`"The test for determining the sufficiency of the corroborative evidence of the testimony of an accomplice is through a `subtraction process.' The test is generally stated:
"`"`First, the evidence of the accomplice must be eliminated, and then, if upon examination of all other evidence, there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense, there is sufficient corroboration.'"

"`McCoy v. State, 397 So.2d [577] at 585 [(Ala.Cr.App.), cert. denied, 397 So.2d 589 (Ala.1981)] (citations omitted, emphasis in original.).
"`"[C]orroborative evidence need not refer to any statement or fact testified to by the accomplice. Neither must it be strong nor sufficient of itself to support a conviction. The probative value of the evidence need only legitimately tend to connect the accused with the crime and need not directly do so. Further, corroborative evidence need not directly confirm any particular fact nor affirm each and every material fact testified to by the accomplice. Corroboration may be proven by circumstantial evidence alone."

"`Mills v. State, 408 So.2d [187] at 191 [(Ala.Cr.App.1981)].'"
607 So.2d at 365. "To corroborate means to make more certain, to confirm, or to strengthen." Ex parte Bankhead, 585 So.2d at 119.
"`[N]on-accomplice evidence of an admission or confession by the accused is sufficient corroboration of an accomplice's testimony to sustain a conviction of the accused.'" White v. State, 352 So.2d 29, 32 (Ala.Cr.App.1977), quoting C. Gamble, McElroy's Alabama Evidence, § 300.01(9) (1977). Here, Burgess's own statement to the police placed him in Gardner's car at the time of the shooting. Although Burgess claimed in his statement that the shooting was an accident, he admitted to pointing the gun at Gardner and to pulling the trigger. Further, although Burgess disavowed his statement to the police at trial, Burgess admitted at trial that he was present in Gardner's car and that he was present at the scene when Gardner was shot.
In addition, Roderick Reynolds, who was being held in the same juvenile detention facility where Burgess was being held after his arrest, testified that Burgess admitted to him that he had killed "a white boy" and that he had left his body in some bushes. Also admitted in evidence at trial were several items belonging to Gardner that were found in Burgess's bedroom at his parents' house. Clearly, the state presented sufficient evidence to corroborate Stevenson's and Jones's testimony to connect Burgess with the commission of the crime charged.
The record reflects that the trial court instructed the jury as follows:
"There has been testimony in this case of an alleged accomplice or accomplices. The uncorroborated testimony of an accomplice is not sufficient to authorize the conviction of a defendant *594 charged with a felony. To corroborate means to make more certain, to confirm or to strengthen. The corroborative testimony need not be strong or sufficient in and of itself to support a conviction. It is up to the jury to decide whether a witness is an accomplice, and if so, whether or not his testimony has been properly corroborated. The test for determining whether there was sufficient evidence to corroborate the testimony of an accomplice is not whether the other evidence standing alone would support a conviction. The test is whether, after eliminating the testimony of the accomplice, the remaining evidence is sufficient to connect the defendant with the crime. A conviction of a felony cannot be had on the testimony of the accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense. As jurors, it is your province to determine what weight is to be assigned that testimony."
(R. 2294-95.) The trial court correctly instructed the jury on the applicable law concerning accomplice testimony. It informed the jury that it must determine whether Stevenson and/or Jones were accomplices and, if they were, whether the state presented sufficient evidence to corroborate their testimony. "We must assume that the jury applied this law when weighing the evidence. We will not reweigh the evidence and substitute our judgment for that of the jury." See Adair v. State, 641 So.2d 309, 312 (Ala.Cr.App. 1993). Accordingly, we find no error here.

XIII.
Burgess contends that he was denied his right to a fair trial because of alleged prosecutorial misconduct. (Issue XV in appellant's brief.) Although Burgess claims that the prosecutor engaged in misconduct throughout his trial, he cites this court to only two instances of alleged prosecutorial misconduct. Specifically, Burgess argues that during the voir dire examination of the jury venire, the prosecutor improperly explained to prospective jurors the state's reasons for not prosecuting his alleged accomplices, Demetrius Stevenson and Richie Jones, for their involvement in the murder of Kevin Gardner. Burgess argues that the prosecutor compounded this alleged error during closing arguments by again discussing the state's reasons for not prosecuting Stevenson or Jones. Burgess maintains that the state's reasons for choosing not to prosecute Stevenson or Jones were never presented as evidence at his trial and were not the proper subject of comment by the prosecutor.
Initially, we note that Burgess made no objection at trial to either of the alleged instances of prosecutorial misconduct. "`This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.'" Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). Thus, we must consider whether the prosecutor's comments and conduct constituted plain error. Rule 45A, Ala.R.App.P.
"In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract." Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App.1989), remanded on *595 other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992), rev'd, 625 So.2d 1146 (Ala.1993). See also Henderson v. State, 583 So.2d 276, 304 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). "In judging a prosecutor's closing argument, the standard is whether the argument `so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Bankhead, 585 So.2d at 107, quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Cr.App.1978), and that court is given broad discretion in determining what is permissible argument." Bankhead, 585 So.2d at 105. We will not reverse the trial court unless there has been an abuse of that discretion. Id.
The record reveals that during the voir dire examination of each panel of prospective jurors, the prosecutor explained to veniremembers that, during the initial phase of the investigation of Gardner's murder, some of the state's witnesses who had led the police to Gardner's body had been granted immunity from prosecution in return for cooperating with the police in identifying the person who had shot Gardner. (R. 470-73; 607-11; 705-09; 827-31.) The prosecutor then proceeded to ask prospective jurors whether, based upon the grant of immunity to these witnesses, they would be able to consider the witnesses' testimony, or whether they would be unable to believe anything the witnesses testified to and unable to consider their testimony at all. The prosecutor told prospective jurors, generally, that the witnesses had been offered immunity because the police were concerned that the witnesses were afraid and otherwise would not continue talking to them. The prosecutor further told prospective jurors that although the police believed these witnesses had not killed Gardner, they also believed that without the cooperation of these witnesses, they would be unable to find out who had killed Gardner. The prosecutor made it clear to prospective jurors that he certainly expected them to consider the fact that these witnesses had been granted immunity when weighing their testimony, but that he wanted to determine whether the prospective jurors would reject the testimony from these witnesses even before hearing it.
Contrary to Burgess's claim on appeal, the state's reason for choosing not to prosecute Stevenson or Jones was presented as evidence at trial. During the state's case-in-chief, Decatur Police Sergeant John Boyd, who investigated Gardner's murder, testified that Stevenson and Jones had been granted immunity because he and other investigating officers believed that the two men were afraid and would leave their interview sessions with the police without providing any information about who had actually killed Gardner. Boyd stated, "They were scared to death, and I was afraid they were going to leave." (R. 1164.) Boyd further testified, "I was afraid when I got them back there [to the police station] and had to advise them of their rights, as scared as they were, that would be it. If they didn't give me a statement or if they invoked their right to counsel, I knew that I was sunk." (R. 1165.) Boyd stated that he then contacted the district attorney and informed him of the situation, and that they agreed at that time that Boyd could assure Stevenson and Jones that they would not be prosecuted for Gardner's murder, if the evidence showed that they had not pulled the trigger.
*596 Because the matter was presented as evidence at trial, we conclude that the prosecutor's comments and questions to potential jurors during voir dire examination concerning the state's reasons for not prosecuting Stevenson or Jones were reasonably designed to elicit any potential bias on the part of prospective jurors. We find no prosecutorial misconduct here. Likewise, the prosecutor's comments with respect to Stevenson and Jones during rebuttal closing argument at the guilt phase of the trial were proper comments based upon the evidence. Whatever is in evidence at the trial of the accused is considered subject to legitimate comment by counsel. Jenkins v. State, 627 So.2d 1034, 1050 (Ala.Cr.App.1992), aff'd, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994). Furthermore, the trial court correctly instructed the jury that the arguments of counsel were not to be considered as evidence in the case. (R. 2191.) There was no error here, plain or otherwise.

XIV.
Burgess contends that the trial court erred to reversal by instructing the jury on the lesser included offense of felony murder. (Issue XII in appellant's brief.)
We point out that Burgess is presenting this claim for the first time on appeal; in fact, Burgess requested that the trial court charge the jury on felony murder. His written requested jury instruction number 5, which was given by the trial court, charged that if the jury found that Burgess had assisted in the plan or scheme to steal Gardner's car and/or actually participated in its theft, but did not kill Gardner or intend that Gardner be killed in the course of the theft, he would be guilty of felony murder, not capital murder. (C. 334-35; R. 2135-36, 2150-51, 2298-2302, 2305.) Furthermore, in giving Burgess's requested instruction on felony murder, the trial court properly charged the jury on the principles of accomplice liability. (R. 2299-2301.) Clearly, the very instruction on felony murder about which Burgess now complains was given at his request.
"`"A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions."'" Slaton v. State, 680 So.2d 879, 900 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Campbell v. State, 570 So.2d 1276, 1282 (Ala.Cr.App.1990). As we have said in applying the invited error doctrine, "`It would be a sad commentary upon the vitality of the judicial process if an accused could render it impotent by his own choice.'" Murrell v. State, 377 So.2d 1102, 1105 (Ala.Cr.App.), cert. denied, 377 So.2d 1108 (Ala.1979), quoting Aldridge v. State, 278 Ala. 470, 474, 179 So.2d 51, 54 (1965). "The invited error rule has been applied equally in capital cases and noncapital cases." Rogers v. State, 630 So.2d 78, 84 (Ala.Cr.App.1991), rev'd on other grounds, 630 So.2d 88 (Ala.1992), aff'd on remand, sub nom. Musgrove v. State, 638 So.2d 1347 (Ala.Cr.App.1992), aff'd, 638 So.2d 1360 (Ala.1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994).
"An invited error is waived, unless it rises to the level of plain error." Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991). Here, it was not plain error for the trial court to charge the jury on the lesser included offense of felony murder. Rule 45A, Ala.R.App.P. The prosecution introduced Burgess's post-arrest statement to police, in which Burgess admitted that he had shot Gardner but maintained that the shooting was an accident. At trial, Burgess testified that throughout the day of Gardner's murder, he had talked *597 with Stevenson and Jones about robbing someone. Burgess further claimed that he knew Stevenson and Jones planned to rob Gardner. The evidence showed that, despite his claim to know of Stevenson and Jones's alleged plan, Burgess rode with Stevenson and Jones in Gardner's car to the remote area where Gardner was shot. Burgess testified that he was aware that Stevenson was carrying a gun. Burgess also testified that he took part in an attempt to sell Gardner's car after the shooting, and he admitted that he stole several items from Gardner's car. Clearly, there could exist a reasonable theory from the evidence that would support the trial court's charging the jury on felony murder as well as on principles of accomplice liability. Finally, because the jury found Burgess guilty of capital murder, an offense involving an intentional murder, any conceivable error in the trial court's charging the jury on felony murder was harmless.

XV.
Burgess contends that the trial court erred by refusing to charge the jury on criminally negligent homicide as a lesser included offense of capital murder. (Issue VIII in appellant's brief.)
"A capital murder defendant is entitled to a charge on a lesser included offense only where there is a reasonable theory from the evidence that would support such a charge." Ex parte Trawick, 698 So.2d 162, 177 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997). A court shall not instruct the jury on a lesser included offense unless there is a rational basis for a guilty verdict on that charge. See § 13A-1-9(b), Ala.Code 1975.
Section 13A-6-4(a), Ala.Code 1975, provides: "A person commits the crime of criminally negligent homicide if he causes the death of another person by criminal negligence." Section 13A-2-2(4), Ala.Code 1975, provides, in pertinent part: "A person acts with criminal negligence with respect to a result ... when he fails to perceive a substantial and unjustifiable risk that the result will occur." This court has stated:
"`An instruction on criminally negligent homicide is proper only where the victim's death was caused by the defendant's inadvertent creation and subsequent disregard of a risk of harm of which he should have been aware, but which in fact he was not aware of.... To warrant the giving of such an instruction there must be some evidence that the defendant was not aware of the risk he was creating.'"
Marshall v. State, 668 So.2d 891, 892 (Ala. Cr.App.1995), quoting Wiggins v. State, 491 So.2d 1046, 1048 (Ala.Cr.App.1986) (citations omitted in Marshall; emphasis in original).
Burgess contends that he was entitled to an instruction on criminally negligent homicide because, he says, the evidence presented at trial "demonstrated that he did not intend to shoot the victim in this case and that the gun went off accidentally." (Appellant's brief p. 48.) The evidence Burgess refers to is contained in his post-arrest statement to the police, where Burgess stated:
"I took the gun out of my pocket as I walked up there. When I got to the car I pointed the gun at [Gardner] and told him to go ahead and give them [Stevenson and Jones] what they wanted. Everything started happening at one time. I already had the hammer cocked back on the gun. You don't have to pull the hammer back to fire the gun. I had the gun stuck in my right front pants, some black jeans. When I straightened my arm out the gun fired."

(R. 1894.) (Emphasis added.)
In Buskey v. State, 650 So.2d 605 (Ala. Cr.App.1994), the defendant, appealing his *598 conviction for murder, argued that the trial court had erred in not charging the jury on the lesser included offense of criminally negligent homicide. We rejected the defendant's claim, holding as follows:
"In this case, the evidence tended to show that the appellant's actions were not the result of negligence. Threatening statements followed by retrieving and firing a rifle are strong indications of an intentional, or at the least, reckless act.
"`"One who intentionally draws a gun in response to or in anticipation of a confrontation with another is certainly aware of the risk that the gun might discharge; therefore, he cannot be guilty of mere criminal negligence. Appellant was guilty of either murder or manslaughter or he was guilty of nothing at all."

"`Robinson v. State, 441 So.2d 1045, 1047 (Ala.Cr.App.1983). See also Wiggins v. State, 491 So.2d 1046 (Ala. Cr.App.1986) (holding that there was no basis for giving a charge on criminally negligent homicide where the appellant testified that he pulled a gun merely to "scare off" the victim and that the gun discharged by accident during a struggle).'

"Lovell [v. State], 521 So.2d [1346,] 1351 [(Ala.Cr.App.1987)]."
650 So.2d at 611.
In the present case, there was no reasonable theory from the evidence that would have supported an instruction on criminally negligent homicide. Burgess stated that he took the gun out of his pocket, pointed it at Gardner, and told Gardner to give Stevenson and Jones what they wanted. The intentional drawing of a gun under these circumstances was at least a reckless actnot merely a criminally negligent act. See Raspberry v. State, 615 So.2d 657, 659 (Ala.Cr.App. 1992), and Surles v. State, 610 So.2d 1254, 1256 (Ala.Cr.App.1992). The trial court's refusal to instruct the jury on criminally negligent homicide as a lesser included offense of capital murder was proper.
Furthermore, even if we were to find that the trial court should have charged the jury on criminally negligent homicide, any error would be harmless. In charging the jury, the trial court instructed on the lesser included offenses of felony murder and reckless manslaughter. "[S]ince the trial court charged the jury on manslaughter, an offense involving reckless conduct, as a lesser included offense of the capital offense of robbery-murder and the jury found the appellant guilty of the capital offense, rejecting manslaughter, the failure to instruct on criminally negligent homicide was not reversible error." Haney v. State, 603 So.2d 368, 399 (Ala.Cr. App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). See also Buskey, supra, 650 So.2d at 611-12 (any speculation that the jury might have found the defendant guilty of criminally negligent homicide is dissipated by the fact that the jury, which was instructed on murder and reckless manslaughter, found him guilty of intentional murder).

SENTENCING ISSUES

XVI.
Burgess contends that § 13A-5-47(e), Ala.Code 1975, which allows the trial court to override the jury's sentencing recommendation of life without parole in favor of a death sentence, is unconstitutional on its face and as applied to him. (Issue XVII in appellant's brief.) He argues that the statute does not provide standards to guide the trial court in weighing and considering the jury's sentencing recommendation, that it disregards the jury's role in sentencing, and that it permits the arbitrary *599 imposition of the death penalty. He further maintains that of the four states that have capital sentencing schemes permitting the trial court to override the jury's sentencing recommendation, only Alabama's permits a "standardless override." Burgess did not raise this matter in the trial court; thus, our review is for plain error. Rule 45A, Ala.R.App.P.
Burgess's claims with respect to § 135-47(e) were addressed and rejected by the United States Supreme Court in Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). The Court in Harris held that the "the Eighth Amendment does not require the State to define the weight the sentencing judge must give to an advisory jury verdict." 513 U.S. at 512, 115 S.Ct. at 1036. The Court further held:
"The Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight."
513 U.S. at 515, 115 S.Ct. at 1037. The Court in Harris noted that the "`Eighth Amendment is not violated every time a State reaches a conclusion different from a majority of its sisters over how best to administer its criminal laws.'" 513 U.S. at 510, 115 S.Ct. at 1034, quoting Spaziano v. Florida, 468 U.S. 447, 464, 104 S.Ct. 3154, 3164, 82 L.Ed.2d 340 (1984).
Alabama's capital sentencing statute "adequately channels the trial court's discretion so as to prevent arbitrary results." Bush v. State, 695 So.2d 70, 94 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997) (citing Harris and rejecting claims that Alabama's statute permits a standardless override). Because Burgess's claims with respect to § 13A-5-47(e) have previously been addressed and rejected, there is no plain error as to this matter.

XVII.
Burgess contends that Alabama's use of the electric chair in carrying out the death penalty does not meet constitutional standards. (Issue XX in appellant's brief.) He specifically argues that Alabama uses "inadequate equipment, unqualified personnel, and inadequate procedures" and that Alabama's electric chair results in "excessive burning and mutilation of condemned prisoners and render[s] death by electrocution in Alabama unpredictable and consistently torturous." (Appellant's brief, pp. 86-87.) These claims were not presented in the trial court; thus, our review is for plain error. Rule 45A, Ala. R.App.P.
It is well settled that death by electrocution does not constitute cruel and unusual punishment in violation of the Eighth Amendment. See Lindsey v. Smith, 820 F.2d 1137 (11th Cir.1987), cert. denied, 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 (1989); Sullivan v. Dugger, 721 F.2d 719 (11th Cir.1983); Lowenfield v. Phelps, 817 F.2d 285 (5th Cir.1987), aff'd, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); Stephens v. State, 580 So.2d 11 (Ala.Cr.App. 1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991); Thompson v. State, 542 So.2d 1286 (Ala.Cr.App.1988), aff'd, 542 So.2d 1300 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989); Jackson v. State, 516 So.2d 726 (Ala.Cr.App.1985), remanded on other grounds, 516 So.2d 768 (Ala.1986). Moreover, Burgess's claims that Alabama's electric chair is antiquated and inadequate and that it results in burning and mutilation of the bodies of those executed have been previously addressed and decided adversely to him. See Thomas v. Jones, 742 *600 F.Supp. 598, 602 (S.D.Ala.1990); Ritter v. Smith, 568 F.Supp. 1499 (S.D.Ala.1983), aff'd in relevant part, rev'd in unrelated part, 726 F.2d 1505, 1519 (11th Cir.), cert. denied, 469 U.S. 869, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984); McNair v. State, 706 So.2d 828 (Ala.Cr.App.1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998); Jackson, 516 So.2d at 738. Accordingly, there is no plain error as to this matter.

XVIII.
Burgess contends that § 15-12-21(d), Ala.Code 1975, which limits court-appointed attorneys' fees to $1000 for out-of-court work in each phase of a capital murder trial, is unconstitutional. (Issue XXII in appellant's brief.) Specifically, he argues that this limitation on compensation violates the separation of powers doctrine; that it constitutes a taking without just compensation; that it deprives an indigent capital defendant of effective assistance of counsel; and that it denies the indigent defendant equal protection of the law. These claims were not presented in the trial court; thus, our review is for plain error. Rule 45A, Ala.R.App.P.
Burgess's claims have been previously addressed and rejected by this court and by the Alabama Supreme Court. See, e.g., Ex parte Smith, 698 So.2d 219 (Ala.1997); Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Hyde v. State, 778 So.2d 199 (Ala.Cr.App.1998); Stewart v. State, 730 So.2d 1203 (Ala.Cr.App.1997); Barbour v. State, 673 So.2d 461 (Ala.Cr. App.1994), aff'd, 673 So.2d 473 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996); May v. State, 672 So.2d 1307 (Ala.Cr.App.1993), writ quashed, 672 So.2d 1310 (Ala.1995); Johnson v. State, 620 So.2d 679 (Ala.Cr.App. 1992), rev'd on other grounds, 620 So.2d 709 (Ala.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993); and Smith v. State, 581 So.2d 497 (Ala.Cr.App. 1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991), aff'd on return to remand, 698 So.2d 189 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997). Accordingly, there is no plain error as to this matter.

XIX.
Burgess contends that he was denied a fair and reliable punishment determination when the trial court considered his presentence report because, he says, the report contained hearsay, inaccurate and highly prejudicial statements that he had no opportunity to deny or to explain, and other information that was obtained in violation of constitutional rights. (Issue VI in appellant's brief.)
In his brief filed with this court, Burgess complains of several matters contained in his presentence report, including (1) what he says were hearsay accounts of his disciplinary problems in school; (2) a letter written by his mother to his probation officer several years before the murder, in which his mother detailed his past behavioral and disciplinary problems; (3) excerpts from psychological evaluations performed on him before his transfer from juvenile court to circuit court; (4) the "details of the offense" section of the report; and (5) his prior juvenile record. In the trial court, Burgess's only objection to the contents of the presentence report was that the "details of the offense" section had been drafted by an individual who was not present at his trial. (R. 2541-42.) Thus, with the exception of this aspect of the report, we review Burgess's claims on appeal pursuant to the plain error standard. Rule 45A, Ala.R.App.P.
Section 13A-5-47, Ala.Code 1975, provides for the trial court's use of a presentence *601 report in capital cases. Section 13A-5-47(b) states:
"Before making the sentence determination, the trial court shall order and receive a written pre-sentence investigation report. The report shall contain the information prescribed by law or court rule for felony cases generally and any additional information specified by the trial court. No part of the report shall be kept confidential, and the parties shall have the right to respond to it and to present evidence to the court about any part of the report which is the subject of factual dispute. The report and any evidence submitted in connection with it shall be made part of the record in the case.
Pursuant to Rule 26.3(b), Ala.R.Crim.P., the presentence report may contain:
"(1) A statement of the offense and the circumstances surrounding it;

"(2) A statement of the defendant's prior criminal and juvenile record, if any;
"(3) A statement of the defendant's educational background;

"(4) A statement of the defendant's employment background, financial condition, and military record, if any;
"(5) A statement of the defendant's social history, including family relationships, marital status, interests, and activities, residence history, and religious affiliations;
"(6) A statement of the defendant's medical and psychological history, if available;
"(7) Victim Impact Statements; and
"(8) Any other information required by the court."
(Emphasis added.)
Clearly, all aspects of the presentence report about which Burgess now complains on appeal concerned matters of the sort allowed by Rule 26.3(b), Ala.R.Crim.P. The claims raised by Burgess concerning any hearsay contained in the presentence report were addressed in Williams v. State, 601 So.2d 1062 (Ala.Cr.App.1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992), where this court stated:
"`"Courts are permitted to consider hearsay testimony at sentencing.... While hearsay evidence may be considered in sentencing, due process requires both that the defendant be given an opportunity to refute it and that it bear minimal indicia of reliability.... These protections apply not just to hearsay testimony but also to any information presented at sentencing.... When, as in this case, the defendant claims that his due process rights were violated by the sentencing court's reliance on materially false information, the defendant must establish not only that the disputed information is materially false or unreliable, but also that the sentencing judge relied on the information."

"`United States v. Giltner, 889 F.2d 1004, 1007 (11th Cir.1989). A sentencing judge may consider hearsay evidence so long as the defendant had a fair opportunity at rebuttal. Smiley v. State, 435 So.2d 202, 206 (Ala.Cr.App. 1983), Johnson v. State, 399 So.2d 859, 864 (Ala.Cr.App.), affirmed in part, reversed in part on other grounds, 399 So.2d 873 (Ala.1979).'"
601 So.2d at 1085, quoting Kuenzel v. State, 577 So.2d 474, 528 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
As the Alabama Supreme Court stated in Ex parte Davis, 569 So.2d 738 (Ala. 1990), cert. denied, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991):
"It is clear to this Court that the use of the presentencing report is consistent with Ala.Code 1975, § 13A-5-45(d), Alabama's *602 capital murder statute, which states:
"`Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the state of Alabama.'
"The entire report itself is an out-of-court statement and is entirely hearsay; however, it is admissible under Ala.Code 1975, § 13A-5-47. Thompson v. State, supra[, 503 So.2d 871 (Ala.Cr.App.1986), aff'd, 503 So.2d 887 (Ala.), cert. denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987) ]. The trial court is not obligated to do more than provide a fair opportunity for rebuttal; where the record indicates that the defendant was given sufficient opportunity to rebut any hearsay statements made at the sentencing hearing, there is no error. Johnson v. State, 399 So.2d 859 (Ala.Crim.App. 1979), aff'd in part and rev'd on other grounds, 399 So.2d 873 (Ala.1979)."
569 So.2d at 741.
The record reflects that Burgess was afforded sufficient opportunity to rebut any of the information contained in his presentence report. The trial court's sentencing order makes specific reference to the fact that the parties were given an opportunity to respond to the contents of the report and to present any evidence regarding any portion of the report that might be the subject of factual dispute. (C. 22.) Even on appeal, Burgess has presented no evidence challenging the accuracy or reliability of the information in the report. See Kuenzel, 577 So.2d at 528 (holding that when the defendant claims that his due process rights were violated by the sentencing court's reliance on materially false information, the defendant must establish that the information is false or unreliable, and that the sentencing judge relied on the information). See also Thompson v. State, 503 So.2d 871, 880-81 (Ala.Cr.App.1986), aff'd, 503 So.2d 887 (Ala.), cert. denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987).
Burgess's specific exception on appeal with respect to the presentence report's inclusion of excerpts from psychological evaluations performed on him before his transfer from juvenile court to circuit court is that he was not read his Miranda rights prior to the interviews and tests that formed the bases of the psychological evaluations. However, because the trial court had already viewed the contents of the psychological evaluations in a youthful offender report on Burgess and because the jury did not see the presentence report that contained the excerpts from the psychological evaluations, there was no error on this issue. Ex parte Hart, 612 So.2d 536, 540-41 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993). Moreover, Burgess was given sufficient opportunity to rebut the information in the psychological evaluations and failed to offer any evidence challenging the accuracy or reliability of that information. Id. at 541.
With regard to Burgess's specific exception to the "details of the offense" section of his presentence report, we fail to see how he was prejudiced by the inclusion of this information in the report. The record reveals that Burgess did not move to strike the "details of the offense" section from the report, but instead asked the trial court to consider, in addition to this section, its own recollection of the facts adduced at trial and to reconcile any conflicts *603 between its own recollection and this section of the report in favor of its own recollection. (R. 2541-42.) The trial court stated that it would comply with Burgess's request. (R. 2542.)
There was no error, plain or otherwise, concerning the trial court's use of Burgess's presentence report.

XX.
Burgess contends that the trial court, in overriding the jury's recommendation of life imprisonment without parole in favor of a death sentence, improperly considered his history of juvenile adjudications to negate the mitigating circumstances found to exist in his case. (Issue IV in appellant's brief.)
Section 13A-5-47, Ala.Code 1975, provides:
"(a) After the sentence hearing has been conducted, and after the jury has returned an advisory verdict, or after such a verdict has been waived as provided in Section 13A-5-46(a) or Section 13A-5-46(g), the trial court shall proceed to determine the sentence.
"(b) Before making the sentence determination, the trial court shall order and receive a written presentence investigation report. The report shall contain the information prescribed by law or court rule for felony cases generally and any additional information specified by the trial court. No part of the report shall be kept confidential, and the parties shall have the right to respond to it and to present evidence to the court about any part of the report which is the subject of factual dispute. The report and any evidence submitted in connection with it shall be made part of the record in the case.
"(c) Before imposing the sentence the trial court shall permit the parties to present arguments concerning the existence of aggravating and mitigating circumstances and the proper sentence to be imposed in the case. The order of the arguments shall be the same as at the trial of the case.
"(d) Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the presentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52. The trial court shall also enter written findings of facts summarizing the crime and the defendant's participation in it.
"(e) In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict, unless such a verdict has been waived pursuant to Section 13A-5-46(a) or 13A-5-46(g). While the jury's recommendation concerning sentence shall be given consideration, it is not binding upon the court."
Section 13A-5-48, Ala.Code 1975, provides, in pertinent part:
"The process described in ... Section 13A-5-47(e) of weighing the aggravating and mitigating circumstances to determine the sentence shall not be defined to mean a mere tallying of aggravating and mitigating circumstances for the purpose of numerical comparison. Instead, it shall be defined to mean a process by which circumstances relevant to sentence are marshalled and considered in an organized fashion for the purpose of *604 determining whether the proper sentence in view of all the relevant circumstances in an individual case is life imprisonment without parole or death."
The record reflects that the trial court found the existence of one statutory aggravating circumstance in Burgess's case: that the murder was committed during the course of a robbery in the first degree. The trial court found the existence of two statutory mitigating circumstances: (1) that Burgess had no significant history of prior criminal activity; and (2) that Burgess was 16 years old at the time of the offense. The trial court further found the existence of the following nonstatutory mitigating circumstances: (1) that Burgess had a good family background and "early rearing in the church;" (2) that Burgess had obtained his GED certificate while incarcerated for the present offense; (3) that Burgess's relationship with his family was based on love and that his family, along with a friend of Burgess's, pleaded with the trial court for mercy; (4) that Burgess did not act alone in the commission of the offense; (5) that Burgess was examined by a psychologist with the Department of Mental Health and Mental Retardation and it was determined that he suffered from an antisocial personality disorder; and (6) that the jury had recommended by a vote of 10-2 that Burgess be sentenced to life imprisonment without parole.
In its sentencing order, the trial court found that the aggravating circumstance in Burgess's case outweighed the mitigating circumstances. The court noted that in reaching its determination, it had not engaged in a "mere tallying" of the aggravating and mitigating circumstances, but had, as provided in § 13A-5-48, Ala.Code 1975, marshalled and considered all the relevant circumstances in an organized fashion for the purpose of determining the proper sentence.
In arguing that the trial court had improperly considered his juvenile adjudications to negate the mitigating circumstances found to exist in his case, Burgess points to the following statements in the trial court's sentencing order, where the court discussed the weight it assigned to certain mitigating circumstances:
"First, the Court found that the defendant does not have a significant history of prior criminal activity. Normally, this would be a very strong mitigating factor; however, the youthful age of the defendant cuts sharply against the weight of this mitigating factor. The defendant, at the time of the offense, was only 16 years of age. The fact that the defendant was a juvenile prevented him from being able to have a criminal record of any significance, juvenile offenses not being recognized as criminal offenses. In fact, the presentencing report indicates that the defendant was adjudged delinquent on a number of occasions for offenses that, had he been an adult, would have contributed to the building of a significant criminal history. Therefore, while the defendant does lack a significant criminal history, the defendant's age and his proven propensity to engage in illegal conduct prevent the Court from placing much emphasis on this mitigating factor.
"Second, the Court assigned mitigation to the fact that the defendant was 16 years of age at the time the offense was committed. Despite this finding however, the defendant has been examined and determined to be competent and has through due process of law been certified by our justice system to be tried as an adult, and, while the Court concedes that youthful indiscretion can frequently explain aberrant behavior, it would be rare indeed to find a 16-yearold who could not appreciate the moral turpitude or legal consequences of the *605 act of murder. This is especially true of an individual who was raised in the church by God-fearing parents and educated in a very good public school system. Further, the Court notes that the defendant has spent a significant amount of time in this State's juvenile facilities and must therefore have a heightened sense of the necessity of constraining his conduct to the bounds of social acceptability. It is therefore the determination of this Court that while a mitigating circumstance DOES EXIST, with regard to the defendant's age, the weight that should be assigned to this mitigating factor is very little indeed."
(C. 28-30.)
Burgess specifically argues that the trial court erred by considering his history of juvenile adjudications to negate the statutory mitigating circumstance of Burgess's lack of a significant criminal history and Burgess's age at the time the offense was committed.[3] In doing so, Burgess says, the trial court "deploy[ed] the prior delinquencies as if they were nonstatutory aggravation to effectively tip the balance in favor of death." (Appellant's brief, p. 18.)
Because juvenile adjudications are not convictions under Alabama law, they cannot be considered as prior criminal activity under Alabama's capital sentencing scheme. Ex parte Davis, 718 So.2d 1166, 1178 (Ala.1998); Freeman v. State, 555 So.2d 196, 212 (Ala.Cr.App.), aff'd, 555 So.2d 215 (Ala.1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990). See Baldwin v. State, 456 So.2d 117, 125 (Ala.Cr.App.1983), aff'd, 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). Thus, juvenile adjudications cannot negate the statutory mitigating circumstance that the defendant has no significant history of prior criminal activity. Freeman, 555 So.2d at 212. Only convictions can negate that statutory mitigating circumstance. Id.
We disagree with Burgess's characterization of the trial court's consideration of his juvenile adjudications. First, the trial court did not find Burgess's juvenile adjudications to be an aggravating circumstance. The record reflects that the trial court found only one aggravating circumstance: that the murder was committed during the course of a robbery in the first degree. Moreover, the trial court did not, as Burgess maintains, use Burgess's juvenile adjudications to negate the statutory mitigating circumstances that Burgess lacked a significant criminal history and that Burgess was only 16 years old at the time of the offense. Instead, it is clear from the trial court's sentencing order that the court considered Burgess's history of juvenile adjudications in assessing the appropriate weight to assign to these statutory mitigating circumstances.[4]
Under Alabama's capital punishment statute, the trial court is required to engage in an individualized assessment of the weight to assign to the aggravating and mitigating circumstances found to exist in a particular case in order to determine the propriety of a sentence of death. § 13A-5-47(e), Ala.Code 1975; Ex parte Clisby, 456 So.2d 105, 108 (Ala.1984), cert. denied, 470 U.S. 1009, 105 S.Ct. 1372, 84 L.Ed.2d 391 (1985). It is clear, moreover, that this weighing process must not be "a mere tallying of aggravating and mitigating *606 circumstances for the purpose of numerical comparison." § 13A-5-48, Ala. Code 1975. See Ex parte Clisby, 456 So.2d at 108-09 ("The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation."). Although it is well-settled law in Alabama that juvenile adjudications cannot be used to negate the statutory mitigating circumstance that the defendant has no significant history of prior criminal activity, Freeman, supra, 555 So.2d at 212, the courts of this state have never held that the trial court must entirely ignore a defendant's juvenile adjudications in performing its "weighing" duties. The trial court's consideration of a defendant's juvenile adjudications when conducting the weighing process offends neither general constitutional principles nor specific provisions of Alabama law. In fact, Alabama's capital punishment statute contemplates that the trial court will have any prior juvenile record of the defendant before it when it is deciding upon the proper sentence: pursuant to § 13A-5-47, Ala.Code 1975, the trial court is required to consider the presentence report of a defendant convicted of capital murder, and Rule 26.3(b)(2), Ala.R.Crim.P., specifically provides for the inclusion of the defendant's prior juvenile record in the presentence report.
To hold that the trial court is prohibited from considering a defendant's juvenile adjudications in its individualized assessment of the weight to assign to the statutory mitigating circumstance of "no significant history of prior criminal activity" would obligate the trial court to assign precisely the same weight to this mitigating circumstance in every case where, such as here, a juvenile defendant is convicted of capital murder. Under this view of the capital sentencing scheme, two juveniles, both the same age and both convicted of capital murder, one with no prior juvenile record and the other with a very significant prior juvenile record, would necessarily benefit equally from the statutory mitigating circumstance of "no significant history of prior criminal activity." This would amount to an endorsement of the sort of numerical "tallying" disallowed by § 13A-5-48, Ala. Code 1975, and an abjuration of the weighing function mandated by § 13A-5-47(e), Ala.Code 1975.
Alabama's capital punishment statute does not specify the matters the trial court may consider when engaging in the process of weighing the aggravating circumstances and the mitigating circumstances in a particular case. Nor does the statute require the trial court to make express findings explaining the process by which it weighed the aggravating circumstances and the mitigating circumstances. We conclude that a trial court may, consistent with Alabama law, deem a defendant's juvenile adjudications to be a relevant consideration in its assessment of the weight to assign to the statutory mitigating circumstances of a defendant's lack of a significant criminal history and a defendant's age at the time of the offense.
We are mindful that statutory aggravating and mitigating circumstances provide an important mechanism that serves to narrow the class of persons eligible for the death penalty. See Zant v. Stephens, 462 U.S. 862, 878, 103 S.Ct. 2733, 2743, 77 L.Ed.2d 235 (1983). Here, the statutory aggravating circumstance in Burgess's casethat the murder was committed during the course of a robberyclearly placed Burgess among that class of persons who could be sentenced to death. Once this "narrowing function" was achieved, the trial court could properly consider other relevant factors in performing its mandated weighing function. The trial court's sentencing order reflects that the court did *607 not improperly consider Burgess's juvenile adjudications as negating the mitigating circumstances found to exist in Burgess's case. The sentencing order, which we find to be conscientiously reasoned, reflects that the trial court based Burgess's sentence on the gravity of the aggravating circumstance as compared to the mitigating circumstances. See Ex parte Clisby, 456 So.2d at 108-09. There was no error here.

XXI.
Burgess contends that the trial court refused to consider the mitigating evidence he offered concerning the state's failure to prosecute his alleged accomplices, Demetrius Stevenson and Richie Jones. (Issue III in appellant's brief.) He further contends that the trial court erred in failing to find the "extremely lenient treatment" of Stevenson and Jones to be a nonstatutory mitigating circumstance in his case.
"In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court held that a death penalty statute cannot constitutionally preclude consideration of relevant mitigating factors. However, Lockett does not require that all evidence offered as mitigating evidence be found to be mitigating. Lockett provides that a state may not exclude evidence that the defendant claims is mitigating. This does not mean that all evidence offered by the defendant as mitigating must be found to be mitigating and considered as such in the sentencing process."
Ex parte Hart, 612 So.2d 536, 542 (Ala. 1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993).
Contrary to Burgess's contention, the record reflects that the trial court did in fact consider the mitigating evidence Burgess offered concerning the state's failure to prosecute Stevenson and Jones. The trial court's sentencing order states, in pertinent part:
"Much emphasis was placed on the fact that the defendant's accomplices remain unpunished for their participation in this offense. The Court finds no aspect of mitigation in this fact. A mitigating circumstance, in this regard, DOES NOT EXIST."
(C. 407.) The fact that the trial court did not find the "lenient treatment" of Burgess's alleged accomplices to be a nonstatutory mitigating circumstance in Burgess's case does not mean that the trial court refused to consider the evidence offered by Burgess. Rather, it indicates only that the trial court did not find that the evidence was mitigating. See Haney v. State, 603 So.2d 368, 389 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).
In his brief to this court, Burgess appears to maintain that under Parker v. Dugger, 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991), and Henderson v. State, 616 So.2d 351 (Ala.Cr.App.1992), the trial court was required to find as a mitigating circumstance the lenient treatment of his alleged accomplices. However, while Parker and Henderson v. State may suggest that the differential treatment of an accomplice may be a proper subject for consideration as mitigating evidence in a capital case, neither case remotely holds that a trial court is obligated to so find, and neither case lends support to Burgess's claim that the trial court erred in his case. "`Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer.'" Boyd v. State, 715 So.2d 825, 840 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.1998), quoting Williams v. State, 710 So.2d 1276, 1347 (Ala.Cr.App.1996), aff'd 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). See also, e.g., Ex parte Hart, 612 *608 So.2d at 542. We find no error in the trial court's refusal to find the state's failure to prosecute Stevenson and Jones to be a nonstatutory mitigating circumstance in Burgess's case.
Here, the state's evidence showed that Burgess's culpability was far greater than that of Stevenson or Jones. The evidence indicated that it was Burgess who selected Gardner's car to steal and Burgess who lured Gardner to a remote area where he then shot Gardner in the head. Although Stevenson and Jones were in Gardner's car when Gardner was shot, they claimed that they were not parties to the killing. They further claimed that they had had no prior knowledge of Burgess's intention to rob or murder Gardner, and both testified that they did not actually participate in the robbery or murder. Thus, under one view of the evidence, neither Stevenson nor Jones was implicated in the capital offense for which Burgess was convicted. Although Burgess claimed at trial that it was Stevenson who shot Gardner, his testimony presented credibility questions to be resolved by the trier of fact. In view of the evidence that Burgess was the trigger-man and the actual perpetrator of the crime, the trial court could properly decline to find that the state's "lenient treatment" of Stevenson and Jones was a mitigating circumstance in Burgess's case. See Bush v. State, 695 So.2d 70, 90 (Ala. Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997) ("The appellant's contention that the trial court should have found the fact that his accomplice was sentenced to life without the possibility of parole sentence to be a mitigating circumstance has no merit. The appellant was the confessed triggerman.").
Furthermore, the fact that Burgess's alleged accomplices were not prosecuted for any involvement in the offense does not detract from Burgess's own legal and moral culpability. In a capital case, mitigating circumstances generally pertain to the defendant's character, background, and record as well as to any extenuating aspects of the defendant's own participation in the offense. See Smith v. State, 756 So.2d 892, 945-46 (Ala.Cr.App.); and Williams, 710 So.2d at 1347. See also California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). Although the trial court did not find the lenient treatment of Burgess's alleged accomplices to be a mitigating circumstance, the trial court did find as a nonstatutory mitigating circumstance the fact that Burgess did not act alone in the commission of the offense.[5] Thus, the trial court considered *609 Stevenson's and Jones's participation in the crime to be an extenuating aspect of Burgess's own participation in the offense. We find no error here.

XXII.
Burgess contends that his death sentence was disproportionate in view of the fact that the state did not prosecute Stevenson and Jones for their involvement in the offense. (Issue VII in appellant's brief.) He further contends that his young agehe was approximately four months shy of his 17th birthday when the offense occurredrequires this court to seriously question the proportionality of his death sentence.
In Ex parte Barbour, 673 So.2d 473 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996), the Alabama Supreme Court stated:
"The Legislature, in adopting § 13A-5-53(b)(3)[, Ala.Code 1975], was attempting to follow the mandate of the United States Supreme Court, in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), that appellate courts examine all death sentences to ascertain `whether the crime was in fact one properly punishable by death, whether similar crimes throughout the state are being punished capitally and whether the sentence of death is appropriate in relation to the particular defendant.' Beck v. State, 396 So.2d 645, 664 (Ala.1980). The United States Supreme Court, in a decision after Gregg, has held that comparative proportionality review is not constitutionally required in every state court death sentence review. Pulley v. Harris, 465 U.S. 37, 43-51, 104 S.Ct. 871, 875-80, 79 L.Ed.2d 29 (1984). In fact, the United States Supreme Court has specifically rejected the claim that a capital defendant can prove an Eighth Amendment violation `by demonstrating that other defendants who may be similarly situated did not receive the death penalty.' McCleskey v. Kemp, 481 U.S. 279, at 306-307, 107 S.Ct. 1756 at 1774-75, 95 L.Ed.2d 262 (1987).
673 So.2d at 474.
The death penalty is not "inappropriate for one defendant simply because his accomplice is not convicted." Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). The United States Supreme Court has stated:
"The Constitution is not offended by inconsistency in results based on the objective circumstances of the crime. Numerous legitimate factors may influence the outcome of a trial and a defendant's ultimate sentence, even though they may be irrelevant to his actual guilt. If sufficient evidence to link a suspect to a crime cannot be found, he will not be charged. The capability of the responsible law enforcement agency can vary widely. Also, the strength of the available evidence remains a variable throughout the criminal justice process and may influence a prosecutor's decision to offer a plea bargain or to go to trial. Witness availability, credibility, and memory also influence the results of prosecutions. Finally, sentencing in state courts is generally discretionary, so a defendant's ultimate sentence necessarily will vary according to the judgment of the sentencing authority. The foregoing factors necessarily exist in varying degrees throughout our criminal justice system."
McCleskey v. Kemp, 481 U.S. 279, 307 n. 28, 107 S.Ct. 1756, 1775 n. 28, 95 L.Ed.2d 262 (1987).
*610 In Wright v. State, 494 So.2d 726 (Ala. Cr.App.1985), aff'd, 494 So.2d 745 (Ala. 1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1331, 94 L.Ed.2d 183 (1987), this court addressed a proportionality claim similar to Burgess's:
"The defendant argues that his sentence of death was `disproportionately severe' in view of the fact that his three co-conspirators were convicted of murder in the second degree and Craig was sentenced to 10 years' imprisonment, McQueen to 20 years' imprisonment, and Tinsley to 25 years' imprisonment. Neither Craig, McQueen, nor Tinsley was prosecuted for a capital offense, but was tried for first degree murder under Alabama Code 1975, § 13-1-70.
"We find that the defendant's sentence is justified because all the evidence identifies him as the `triggerman' and the individual who actually shot and killed Mr. and Mrs. Green. At the defendant's trial, Craig and McQueen testified that the defendant admitted shooting the Greens. At Tinsley's trial, McQueen testified that after the crime the defendant admitted `he shot both peoples.' Tinsley [v. State], 395 So.2d [1069] at 1076 [(Ala.Cr.App.1980)]. In Tinsley's trial, the State introduced Tinsley's confession wherein Tinsley stated that `two shots were fired, both by Wright.' Tinsley, 395 So.2d at 1070. Apparently, Craig's and McQueen's convictions were not appealed so this Court has no knowledge of the evidence presented there.
"The Constitution does not require state appellate courts to compare a defendant's death sentence with sentences imposed in similar cases to determine if the death sentence was proportionate. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). `The Constitution permits qualitative differences in meting out punishment and there is no requirement that two persons convicted of the same offense receive identical sentences.' Williams v. Illinois, 399 U.S. 235, 243, 90 S.Ct. 2018, 2023, 26 L.Ed.2d 586, 594 (1970); United States v. Satterfield, 743 F.2d 827, 841 (11th Cir.1984), cert. denied, 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985). `The Supreme Court has stated that discretionary decisions of state prosecutors to grant immunity to some participants of a crime and not others is not arbitrary or cruel and unusual under the constitution. See Gregg v. Georgia, 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976) (Justices Stewart, Powell, and Stevens); Proffitt v. Florida, 428 U.S. [242] at 254, 96 S.Ct. [2960] at 2967 [49 L.Ed.2d 913 (1976) ].' Palmes v. Wainwright, 725 F.2d 1511, 1524 (11th Cir.), cert. denied, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984). Such a contention of disproportionality based on a grant of immunity does not present a `cognizable basis for relief.' Id.

". . . .
"This Court considered the principles involved in this issue in Williams v. State, 461 So.2d 834, 849 (Ala.Cr.App. 1983), reversed on other grounds, Ex parte Williams, 461 So.2d 852 (Ala. 1984):
"`While Beck v. State, 396 So.2d [645] at 664 [(Ala.Cr.App.1980)], obligates this Court to consider the punishment received by alleged accomplices, it does not require or direct that every defendant implicated in a crime receive the same punishment. "There is not a simplistic rule that a co-defendant may not be sentenced to death when another co-defendant receives a lesser sentence. Collins v. State, 243 Ga. 291, 253 S.E.2d 729 (1979). Each case is evaluated on its unique factual circumstance." McClesky v. State, 245 Ga. 108, 263 S.E.2d 146, 151, cert. denied, 449 U.S. 891, 101 S.Ct. 253, 66 *611 L.Ed.2d 119 (1980). See also Justus v. State, 247 Ga. 276, 276 S.E.2d 242, 245-46, cert. denied, 454 U.S. 882, 102 S.Ct. 366, 70 L.Ed.2d 193 (1981). Citing Lockett v. Ohio, 438 U.S. 586, 602-605, 98 S.Ct. 2954, 2963-65, 57 L.Ed.2d 973 (1978), the Supreme Court of South Carolina has held that while a number of "defendants are equally guilty of the crime of murder..., they are not ipso facto deserving of the same punishment." State v. Shaw, 273 S.C. 194, 255 S.E.2d 799, 804, cert. denied, 444 U.S. 957, 100 S.Ct. 437, 62 L.Ed.2d 329 (1979).
"`The one fact that the defendant was the "triggerman" is sufficient to distinguish him from the others for purposes of the death penalty. Shaw, 255 S.E.2d at 804. See also Justus, 276 S.E.2d at 245; McClesky, 263 S.E.2d at 151. The fact that the defendant was the actual perpetrator of the crime, the triggerman, is an important and very significant factor to weigh in determining whether the defendant's sentence to death is excessive or disproportionate to the penalty imposed in the cases of his co-defendants, Clark v. Commonwealth, 220 Va. 201, 257 S.E.2d 784, 792-96 (1979), cert. denied, 444 U.S. 1049, 100 S.Ct. 741, 62 L.Ed.2d 736 (1980).'
"Because of `the need for individualized consideration as a constitutional requirement in imposing the death sentence', Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973, 990 (1978), the focus must be on the defendant. Enmund v. Florida, 458 U.S. 782, 798, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140, 1152 (1982); Williams [v. State], 461 So.2d [834] at 849-50 [(Ala. Cr.App.1983), reversed on other grounds, 461 So.2d 852 (Ala.1984) ].
"The fact that charges against a codefendant/accomplice were nol-prossed because of insufficient evidence does not render the defendant's death sentence constitutionally excessive. Womack v. State, 435 So.2d 754, 763 (Ala.Cr.App.), affirmed, Ex parte Womack, 435 So.2d 766, 769 (Ala.1983). See also Ex parte Dobard, 435 So.2d 1351, 1357 (Ala.1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984) (In view of evidence that it was defendant who fired fatal shots at police officer and that his culpability was greater than that of his younger female accomplice, imposition of death penalty on defendant was not disproportionate to sentence of accomplice, who received a twenty-year sentence.); Heath v. State, 455 So.2d 898, 900-01 (Ala.Cr.App.1983), affirmed, Ex parte Heath, 455 So.2d 905 (Ala.1984), cert. granted in part, 470 U.S. 1026, 105 S.Ct. 1390, 84 L.Ed.2d 780 (Defendant's death sentence is appropriate notwithstanding the fact that the two co-conspirators each received a ten-year sentence.); Dunkins v. State, 437 So.2d 1349, 1356 (Ala.Cr.App.), affirmed, Ex parte Dunkins, 437 So.2d 1356 (Ala.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1329, 79 L.Ed.2d 724 (1984) (Death penalty upheld even though accomplice pled guilty and received life imprisonment.). Even assuming that a defendant's co-defendants deserved the death sentence would not justify reducing the defendant's death sentence. Ex parte Thomas, 460 So.2d 216, 226-27 (Ala.1984). See also Ex parte Raines, 429 So.2d 1111, 1112-13 (Ala.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983).
"We find that the defendant's sentence was not `disproportionately severe.'"
494 So.2d at 739-41 (emphasis added).
While this court will not overlook the absence of prosecution of Burgess's alleged accomplices, their involvement in *612 the offense is clearly distinguishable from Burgess's involvement and does not detract from the persuasiveness of the evidence against Burgess. This is not a case where a more culpable codefendant received a less severe sentence. The state's evidence showed that Burgess's culpability was far greater than that of Stevenson or Jones and the evidence pointed to the inescapable conclusion that Burgess was the "leader" on the night of the offense and was the actual triggerman in the murder. Accordingly, we do not find that Burgess's death sentence was disproportionate simply because the state did not prosecute his alleged accomplices. See McNair v. State, 706 So.2d 828, 844-45 (Ala.Cr.App.1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998) (the appellant's death sentence was not disproportionately severe to the sentence received by his codefendant where the appellant was, in effect, the triggerman"he wielded the knife and personally inflicted the wounds that killed the victim"); Boyd v. State, 542 So.2d 1247, 1260 (Ala.Cr.App.1988), aff'd, 542 So.2d 1276 (Ala.), cert. denied, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989) (the fact that the appellant's accomplice received a sentence of life imprisonment without parole did not render the appellant's death sentence disproportionate); and Neelley v. State, 494 So.2d 669, 682 (Ala.Cr.App.1985), aff'd, 494 So.2d 697 (Ala.1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987) (although a factor to consider when reviewing the proportionality of a death sentence, the fact that the appellant's husband/accomplice had not been prosecuted for his participation in the victim's murder did not render the appellant's death sentence disproportionate).
In arguing that his young age renders his death sentence disproportionate, Burgess contends that "to send a youth to death who has no history of violent crime and has been given no treatment is to abandon the possibility of rehabilitation before it is attempted and to hold that there is no possibility of redeeming an adolescent offender." (Appellant's brief, p. 39.) He maintains that "[t]eenage boys often act rashly out of a show of bravado or a need to prove themselves in the world." (Appellant's brief, p. 39.) He goes on to argue that his "participation in this crime with older participants reflects the kind of poor judgment and thoughtlessness that is sometimes generated by destructive peer influences and a lack of maturity." (Appellant's brief, p. 42.)
In Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), the United States Supreme Court held:
"We also reject the petitioners' argument that we should invalidate capital punishment of 16- and 17-year-old offenders on the ground that it fails to serve the legitimate goals of penology. According to petitioners, it fails to deter because juveniles, possessing less developed cognitive skills than adults, are less likely to fear death; and it fails to exact just retribution because juveniles, being less mature and responsible, are also less morally blameworthy. In support of these claims, petitioners and their supporting amici marshal an array of socioscientific evidence concerning the psychological and emotional development of 16- and 17-year olds.
"If such evidence could conclusively establish the entire lack of deterrent effect and moral responsibility, resort to the Cruel and Unusual Punishments Clause would be unnecessary; the Equal Protection Clause of the Fourteenth Amendment would invalidate these laws for lack of rational basis. See Dallas v. Stanglin, 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989). But as the adjective `socioscientific' suggests (and insofar as evaluation of moral responsibility *613 is concerned perhaps the adjective `ethioscientific' would be more apt), it is not demonstrable that no 16-year-old is `adequately responsible' or significantly deterred. It is rational, even if mistaken, to think the contrary."
492 U.S. at 378, 109 S.Ct. at 2979.
Throughout its sentencing order, the trial court referred to Burgess's young age as a factor that it considered before it reached its sentence determination. Although the trial court found Burgess's age of 16 years to be a statutory mitigating circumstance, it stated as follows in its sentencing order:
"[W]hile the Court concedes that youthful indiscretion can frequently explain aberrant behavior, it would be rare indeed to find a 16-year-old who could not appreciate the moral turpitude or legal consequences of the act of murder. This is especially true of an individual who was raised in the church by God-fearing parents and educated in a very good public school system. Further, the Court notes that the defendant has spent a significant amount of time in the State's juvenile facilities and must therefore have a heightened sense of the necessity of constraining his conduct to the bounds of social acceptability. It is therefore the determination of this Court that while a mitigating circumstance DOES EXIST, with regard to the defendant's age, the weight that should be assigned to this mitigating factor is very little indeed."
(C. 410-11.)
Clearly, the trial court considered Burgess's age before reaching its sentence determination. Burgess was afforded the individualized sentencing to which he was entitled. We agree with the state's contention in its brief to this court "that the cold, calculated, and brutal infliction of a gunshot wound to the head at close range can certainly not be attributed to youthful indiscretion and peer influences." (State's brief, p. 59.) Burgess's actions certainly are not reflective of mere "thoughtlessness generated by destructive peer influences and a lack of maturity." Even though Burgess's alleged accomplices were older than BurgessStevenson was 18 years old at the time of the offense and Jones was 19 years oldwe do not find this fact to be significant in our review of Burgess's sentence. First, the age differences between Burgess and his alleged accomplices were not that great. Second, and more important, the state's evidence showed that it was Burgess who chose Gardner as his victim, lured him to a remote area, and pulled the trigger. We note, moreover, that, contrary to his claim on appeal, Burgess had on numerous occasions before committing the capital offense been provided treatment and afforded opportunities to rehabilitate himself. We do not find that Burgess's death sentence was disproportionate simply because of his young age. See Ex parte Davis, 554 So.2d 1111, 1112-13 (Ala.1989), cert. denied, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991) (citing Stanford v. Kentucky, the Alabama Supreme Court held that the death sentence for the 17-year-old defendant was not unconstitutional); Hart v. State, 612 So.2d 520, 535 (Ala.Cr.App. 1992), aff'd, 612 So.2d 536 (Ala.), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993) (citing Stanford v. Kentucky when reviewing the propriety of a death sentence, this court held that a death sentence imposed on the 16-year-old defendant was not unconstitutional based on the defendant's age).

XXIII.
Burgess contends that the cumulative effect of all the errors allegedly committed in the trial of his case violated his rights to due process and to a fair trial. (Issue XXIII in appellant's brief.) We do not *614 agree. We have reviewed each and every allegation of error as well as the cumulative effect of such alleged errors and find that the cumulative effect of these alleged errors does not warrant a reversal. Moreover, the claimed errors to which Burgess refers have now been determined to be without merit. Because no single instance of alleged error constituted reversible error, we will not consider the cumulative effect to be any greater. See Boyd v. State, 715 So.2d 825, 851 (Ala.Cr.App. 1997), aff'd, 715 So.2d 852 (Ala.1998).

XXIV.
In accordance with Rule 45A, Ala.R.App. P., we have examined the record for any plain error with respect to Burgess's capital murder conviction and death sentence, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings, either in the guilt phase or in the sentencing phase of the trial.
We have also reviewed Burgess's sentence in accordance with the § 13A-5-53, Ala.Code 1975, which requires that, in addition to reviewing the case for any error involving Burgess's capital murder conviction, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Burgess of the capital offense charged in the indictment, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala.Code 1975. After hearing evidence concerning aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended a sentence of life imprisonment without parole by a vote of 10-2.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence Burgess to life imprisonment without parole as recommended by the jury or to death. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). Upon conclusion of the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala. Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense and Burgess's participation in the offense.
In its findings of fact, the trial court found the existence of one statutory aggravating circumstance: that the murder was committed while Burgess was engaged in the commission of a robbery, see § 13A-5-49(4), *615 Ala.Code 1975. In considering this statutory aggravating circumstance, the trial court stated:
"The Court is presented with only one aggravating circumstance for its consideration, that being that the victim's murder took place during the course of a robbery in the first degree or an attempt thereof. There are, nevertheless, several aspects of this aggravating factor that the Court finds particularly disturbing and uncharacteristic of most homicides seen by this Court.
"First, this offense shows an unusually high degree of premeditation. The defendant and his accomplices thought through their scheme and had even considered how they would dispose of the victim's automobile before the automobile or the victim had even been selected. It was the defendant who selected the car, selected the victim, and lured the victim away from a public place.
"The evidence was that the defendant was careful to pick just the right victim. In fact, he apparently passed several potential victims, earlier in the day, until he found both the victim and automobile that he wanted.
"The Court notes that, in selecting a victim, the defendant made no attempt to conceal his identity or to choose a victim who was a stranger, rather, he selected a fellow classmate, someone whom he knew and could take into his confidence. The defendant picked a young victim who was not likely to have a weapon on him, all the time secure in the knowledge that he himself was carrying a firearm.
"It is apparent from the evidence that the defendant had more than ample opportunity to abandon his plan. Even after selecting a victim, he could have abandoned the plan prior to reaching his accomplice's apartment, before the entourage left for Ray Avenue, or during the ride to Ray Avenue. However, the defendant chose to remain steadfast in his plan.
"The second disturbing characteristic that the Court wishes to note is the senselessness of the killing itself. There was no evidence whatsoever that the victim resisted his assailants at all. In fact, the evidence was that no demand was ever made for his car. The victim was simply lured to the murder scene and killed, all efforts to take his car being made thereafter. The Court also notes that, had the defendant and his accomplices been worried about potential identification by the victim, they could have simply selected a stranger, or at the very least, made some attempt to conceal their identities. In fact, if theft were all the defendant had in mind, he could have accomplished that without ever having to leave the parking lot where he encountered the victim. After all, he had the advantage of having a gun. This murder was utterly unprovoked and defies any rational explanation."
(C. 27-28.)
The trial court found the existence of two statutory mitigating circumstances: (1) that Burgess had no significant history of prior criminal activity, see § 13A-5-51(1), Ala.Code 1975, and (2) that Burgess was 16 years old at the time of the offense, see § 13A-5-51(7), Ala.Code 1975. The trial court also heard testimony regarding Burgess's character or record and any of the circumstances of the offense that Burgess offered as a basis for sentencing him to life imprisonment without parole instead of death, see § 13A-5-52, Ala.Code 1975. In this regard, the trial court found the existence of the following nonstatutory mitigating circumstances: (1) that Burgess had a good family background and "early rearing in the church"; (2) that Burgess had obtained his GED certificate while *616 incarcerated for the present offense; (3) that Burgess's relationship with his family was based on love and that his family, along with a friend of his, pleaded with the trial court for mercy; (4) that Burgess did not act alone in the commission of the offense; and (5) that Burgess was examined by a psychologist with the Department of Mental Health and Retardation and it was determined that he suffered from an antisocial personality disorder. The trial court stated in its order that although it found that these mitigating circumstances existed, it did not assign much weight to them, for reasons that are thoroughly discussed in the sentencing order.
The trial court further considered and found to exist as a nonstatutory mitigating circumstance that the jury had recommended by a vote of 10-2 that Burgess be sentenced to life imprisonment without parole. The trial court's sentencing order reflects that the trial court gave a "significant amount of mitigation to the fact that the jury recommended life" imprisonment; however, the trial court notes in the sentencing order that the jury did not have the "benefit of the pre-sentencing report which paint[ed] a drastically different picture of the defendant than that which was presented in the `penalty phase.'" (C. 413.) At the guilt phase of the trial Burgess's counsel argued to the jury as follows:
"[Burgess] was just a child, much like any other when [the murder] happened, so we are not dealing with some incorrigible individual who breaks the law on a daily type basis and for whom the courtroom is a very familiar place."
(R. 2471.) Counsel also argued to the jury that Burgess had not been in trouble before. (R. 2470.) These arguments were proper for counsel to make before the jury. However, as the trial court noted, the jury was not permitted to see the presentence report. The presentence report contained Burgess's juvenile record, which suggested that Burgess was more familiar with the courtroom than counsel had argued.
The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury and after weighing the aggravating circumstance against the statutory and nonstatutory mitigating circumstances in the case, the trial court found that the aggravating circumstance outweighed the statutory and nonstatutory mitigating circumstances. Accordingly, the trial court sentenced Burgess to death. The trial court's findings concerning the aggravating circumstance and the mitigating circumstances are supported by the evidence.
Burgess was convicted of the offense of murder committed during the course of a robbery. This offense is defined by statute as a capital offense. See § 13A-5-40(2), Ala.Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., Clemons v. State, 720 So.2d 961 (Ala.Cr.App.1996), aff'd, 720 So.2d 985 (Ala.1998); Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Brownlee v. State, 545 So.2d 151 (Ala.Cr.App.1988), aff'd, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989); Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989); Davis v. State, 536 So.2d 110 (Ala. Cr.App.1987), aff'd, 536 So.2d 118 (Ala. 1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989); Cochran *617 v. State, 500 So.2d 1161 (Ala.Cr.App. 1984), aff'd in part, rev'd in part, 500 So.2d 1179 (Ala.1985), aff'd on return to remand, 500 So.2d 1188 (Ala.Cr.App.), aff'd, 500 So.2d 1064 (Ala.1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987).
After carefully reviewing the record of the guilt phase and the sentencing phase of Burgess's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstance against the statutory and nonstatutory mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstance outweighs the mitigating circumstances, and that death is the appropriate sentence in this case. Considering the crime committed and Burgess, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. We have also considered Burgess's age and the fact that Burgess's alleged accomplices were neither charged nor prosecuted for any offense stemming from their involvement with Burgess on the night of Gardner's murder. For the reasons discussed in Part XXII of this opinion, we do not find these factors to require us to reach a different result than did the trial court.
Burgess's conviction and sentence of death are affirmed.
AFFIRMED.
McMILLAN, COBB, BROWN, and BASCHAB, JJ., concur.
NOTES
[1] Panels 1 and 2 each consisted of 12 prospective jurors; panel 3 consisted of 11 prospective jurors; and panel 4 consisted of 13 prospective jurors.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] Burgess's juvenile record from March 1988 to November 1992 included adjudications of delinquency for theft of property in the third degree, disorderly conduct, carrying a concealed weapon, and burglary in the third degree.
[4] The trial court expressly recognized in its sentencing order that juvenile adjudications do not constitute criminal convictions.
[5] In its sentencing order, the trial court found, in pertinent part:

"The defense emphasized in both the `guilt phase' and `penalty phase' of this trial that the defendant did not act alone in the perpetration of this offense. The Court finds that it is relevant to the issue of sentencing that there were accomplices to this offense, and the Court finds that a mitigating circumstance DOES EXIST with regard to the fact that the criminal enterprise which resulted in the capital murder was not wholly and completely a product of the defendant's own design.
". . . .
"... [T]he Court has assigned some mitigation to the fact that the defendant did not act alone in the commission of this offense. However, it is apparent from the facts in this case that the defendant was the individual who selected the victim and who was the one responsible for escalating the car theft into a homicide. It would appear from the evidence that it was the other boys' participation which was relatively minor by comparison to the defendant's. The fact that the other accomplices to this offense have not been made accountable for their participation is unfortunate, but does not in any way relieve the defendant of his culpability for this act. The Court further notes that it will not go behind the jury's verdict to question the credibility of the witnesses who testified against the defendant, that determination properly being the province of the jury." (C. 407-13.)